**FRANTZ MANUFACTURING COMPANY, Plaintiff-Appellee and Appellant,**

v.

**PHENIX MANUFACTURING COMPANY, Inc., Defendant-Appellant and Appellee.**

Nos. 18975, 71–1069.

United States Court of Appeals, Seventh Circuit.

March 16, 1972.

Curtis F. Prangley, Mark H. Clayton, Chicago, Ill., Joseph P. House, Jr., Milwaukee, Wis., for Frantz Mfg. Co.

Glenn O. Starke, Elwin A. Andrus, Milwaukee, Wis., for Phenix Mfg. Co.

Before DUFFY, Senior Circuit Judge, and KERNER * and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Plaintiff originally alleged that defendant's overhead garage doors infringed two mechanical patents and a design patent. Before trial the parties stipulated that the earlier mechanical patent ('699) [1] was not infringed. With respect to the later mechanical patent ('612), [2] the questions are whether the district court, 307 F.Supp. 822, properly construed 35 U.S.C. § 102(b) in holding that the invention was in public use more than a year before the patent application was filed, and if so, whether he properly rejected plaintiff's alternative contention that the '612 patent was entitled to '699's earlier filing date. With respect to the design patent (Des. '094), [3] the questions are whether it satisfied the requirements for patentability set forth in 35 U.S.C. § 171, and if so, whether the finding of infringement was proper.

## I.

On June 19, 1959, plaintiff made its first shipment of a fiberglass overhead garage door which was thereafter manufactured and sold in large quantities. [4] The door was mounted on tracks for movement from a closed vertical position to an open horizontal position within the garage. The door included four rectangular sections arranged (when the door was closed) one above the other, and hinged together to facilitate movement around the curved portion of the track.

Each section included a metal frame enclosing a plastic panel. Each frame performed the dual function of securing the enclosed panel and also forming a hinging joint with the frame of the adjacent section. The joining function is not pertinent here; our attention is directed to the relationship between the metal frame and its enclosed plastic panel. More narrowly, we are specifically concerned with the horizontal rails at the top and bottom of each section. [5]

In the lower three sections of the door, the top rail contained two horizontal flanges, extending from one end of the door to the other, which, if viewed from a cross section, might be likened to an inverted letter "J." The panel was placed between the two flanges and secured by rivets which pierced the longer rear flange. The shorter front flange was pressed snugly against the panel. The pressure thus applied was intended to effect a waterproof closure, but was not sufficient to embed the aluminum flange into the compressible plastic panel. [6]

The door which was sold on June 19, 1959, included various novel features which we need not explain. They were

---

* Judge Kerner heard oral argument, but did not participate in the adoption of this opinion.

1. Patent No. 3,104,699, covering overhead door construction, issued September 24, 1963.

2. Patent No. 3,169,612, covering overhead door construction, issued February 16, 1965.

3. Design Patent No. 194,094, covering overhead garage door, issued November 20, 1962.

4. Three days later it filed its application for design patent, Des. '094.

5. Since the joint between the two sections is composed of the lower horizontal rail of the upper section and the upper horizontal rail of the lower section, the patent specifications confusingly, but accurately, describe the former as an "upper joining rail." We have accepted plaintiff's helpful suggestion that in this case such a rail should be consistently referred to as a "bottom rail" and the "lower joining rail" should be referred to as a "top rail."

6. The district court found:
 "The aluminum rail on the 1959 door was rolled down by use of a hand roller, and the evidence shows that the flange was not embedded in the panel." A. 411.

described in the application, filed on August 17, 1959, which led to the issuance of patent '699 some four years later.

On July 5, 1960, plaintiff's assignors filed the application which matured into patent '612. That application related particularly to the construction of the door sections and, more narrowly, to the method of securing the plastic panel in the aluminum frame.

Shortly after plaintiff's first shipment on June 19, 1959, it began to use a power driven roller instead of the hand cranked machine to press the short front flange against the plastic panel. Plaintiff later realized that when the short front flange was embedded in the compressible plastic panel by using the power roller, it was held so securely that it was no longer necessary to use rivets to attach the panel to the rear horizontal flange. This discovery led to the development of an improved door model and to the filing of the July 5, 1960, application and the issuance of patent '612.

The district court held that the public sale on June 19, 1959, more than a year before the filing date of the '612 application, invalidated the patent under 35 U.S.C. § 102(b).[7] As a matter of law he concluded that the test under § 102(b) is not identity, but whether the difference between the prior sale item and the subject matter of the claims is itself patentable.[8] As a matter of fact, he found that the only genuine difference

between the sale door and the patent did not constitute invention.[9]

Plaintiff thereafter was granted leave to supplement the record by filing a copy of the '699 patent, but the court, 314 F. Supp. 99, rejected the contention that the § 102(b) defense could be avoided by giving the '612 patent the benefit of '699's filing date. The design patent was found valid and infringed. Both parties have appealed.

We first consider the test of invalidity under § 102(b) and whether that test was correctly applied in this case. We shall then discuss the contention that the '612 patent should have the benefit of an earlier filing date. Finally, we shall review the design patent.

## II.

There were several differences between the door sold on June 19, 1959, and the improved model described in the '612 patent. In the sale door the front flange was rolled in only on the top rail of the lower three sections; the '612 patent contemplated such rolling on the top and bottom rails of all four sections. The district court found that the flange on the sale door was not actually embedded into the plastic panel; the '612 patent unequivocally describes such embedment. The sale door, although intended to be watertight, actually was subject to leakage between the frame and the panel as a result of capillary action; the '612 pat-

---

7. The statute provides:
 "A person shall be entitled to a patent unless—
 * * * * *
 "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . ."

8. "Under 35 U.S.C. § 102(b), the item involved in the prior sale need not be identical to that described in the claims of the patent; to determine whether the patent is invalid, the test is that the difference between the prior sale item and the patent must itself be patentable." A. 411.

9. "In my opinion, it does not matter whether the idea of embedment came first, with the subsequent application of more pressure, or whether the idea of greater pressure came first, with the resulting embedment; I find that in either event this procedure does not attain the level of invention.
 * * * * *
 "In my opinion, the only genuine difference between the door sold on June 19, 1959 and the mechanical patent here in issue is the degree of rolling force utilized. The addition of a power driven roller was a mechanical refinement and not patentable. Thus, patent numbered 3,169,612 is invalid and unenforceable under 35 U.S.C. § 102(b)." A. 412–413.

ent describes a waterproof closure. In the sale door rivets secured the panel to the rear horizontal flange; the '612 specifications refer to the elimination of such rivets. Thus, it is clear that there was not complete identity between the sale door and the '612 patent.

Plaintiff contends that § 102(b) is inapplicable because defendant failed to prove that the '612 invention was "identically disclosed" by the sale door. Moreover, if a test of nonobviousness rather than complete anticipation is proper, plaintiff contends that the district court erroneously failed to make findings required by Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545.

### A. Interpretation of § 102(b).

Plaintiff's position is supported by the language of § 103 which implies that no prior reference is within § 102 if "the invention is not identically disclosed or described" therein,[10] by comments in several opinions written after 1952, and by one holding which, though subsequently overruled by a divided court, was regarded as a correct state-ment of the law by a member of the Court of Customs and Patent Appeals.[11] We are nevertheless persuaded that the enactment of § 103 was not intended by Congress to incorporate a "strict identity" test into § 102(b). In brief, the reasons for our conclusions are the state of the law prior to the 1952 codification, the fact that the 1952 enactment was primarily intended to restate the law, and the fact that the addition of § 103 was directed to a wholly different problem. We first put to one side the authorities on which plaintiff relies.

Plaintiff's principal reliance is upon this court's description of "the defense of anticipation" in Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F. 2d 1180, 1182–1183 (1971). We there reiterated a dictum from a Tenth Circuit opinion [12] which quoted from two earlier decisions of the Ninth Circuit.[13] Neither our opinion, nor any of the earlier references, involved the § 102(b) issue which is now before us. As we expressly noted, we were there considering the defense of anticipation predicated on § 102(a); [14] such anticipation "speaks only to the novelty of an invention." [15] In

10. The language of § 103 certainly may be read to draw a distinction between a judgment based on a comparison between the claims and the prior art studied as a whole, on the one hand, and a comparison with a specific reference, on the other. Section 103 reads as follows:
"§ 103. Conditions for patentability; non-obvious subject matter.
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

11. See the dissenting opinion of Judge Smith in Application of Foster, 343 F.2d 980, 993–999, 52 CCPA 1808 (1965), cert. denied, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307, adhering to that court's

earlier holding in Application of Palmquist, 319 F.2d 547, 51 CCPA 839 (1963).

12. McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 398 (1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851.

13. National Lead Co. v. Western Lead Products Co., 324 F.2d 539, 544 (1963); Stauffer v. Slenderella Systems of California, Inc., 254 F.2d 127, 128 (1957).

14. We stated:
"The defense of anticipation derives principally from 35 U.S.C. § 102(a) which provides:
"'A person shall be entitled to a patent unless—(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant * * *.'" 436 U.S. at 1182.

15. Id. at 1183. We continued:
"Anticipation, however, speaks only to the novelty of an invention. [Citing Amphenol Corp. v. General Time Corp., 397 F.2d 431, 437–438 (7th Cir. 1968).]

that case, as in each of the other cases upon which plaintiff relies, decision actually turned on acceptance or rejection of the defense of obviousness.[16]

Section 102(a), like § 103, focuses upon the state of the art at the date of invention. Section 102(b), however, is not concerned with prior art which anticipated the invention date; it is concerned with the filing of the patent application. Prior to 1952 it was perfectly clear that an invention had to embody a significant conceptual advance over the state of the art existing (a) when the invention was discovered or made and also (b) one year prior to the filing date of the application. Both time requirements were included in the same statutory provision defining the conditions of patentability.[17] The test of "invention" now reflected in § 103 was then applicable equally to the prior art which is now described in § 102(b) as well as to the art described in § 102 (a).

A quotation from Hall v. Macneale is appropriate, not because of the similarity between an improvement intended to make safe doors burglarproof and an improvement intended to make garage doors waterproof, but rather because both improvements were discovered after the basic conception had been disclosed and, although novel, neither amounted to invention:

> "It clearly appears, from the testimony of the appellant himself, that the idea of making a claim to the invention covered by claim 3 of the patent sued on arose from the introduction into safes, in 1866 or early in 1867, of plates of steel and iron welded together. This enabled the value of the screw-threaded conical bolt to be more fully developed because the screw-thread could be made more effective the whole length of the bolt. But the whole invention existed in the bolt of the patent of 1860. There was no invention in adding to the solid conical bolt the screw-thread of the cored conical bolt.
>
> "Moreover, the use and sale of the solid conical bolts in the Lafayette and Loraine County safes, even though those bolts had no screw-threads on them, constituted a use and sale of the invention covered by claim 3 of the patent in suit. The application for that patent was made in March, 1867, and the patent was granted under the provisions of the act of July 4, 1936, c. 357, and of the act of March 3, 1839, c. 88. Within the meaning of sections 7 and 15 of the act of 1836, as modified by section 7 of the act of 1839, the invention covered by claim 3 of the patent in suit was in use and on sale more than two years before the appellant applied for that patent, and such use and sale were, also, with the consent and allowance of the appellant, and the use

---

"Conversely, the defense of obviousness raises the question of inventiveness and derives from 35 U.S.C. § 103. The obviousness test is somewhat broader in its restrictions on the issuance of valid patents, and prior art which does not render an invention anticipated may nonetheless make it obvious."

16. This was also true of the Second Circuit case cited by plaintiff. See Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 267 (2d Cir. 1967). Plaintiff also cites Ceramic Tilers Supply, Inc. v. Tile Council of America, Inc., 378 F.2d 283 (9th Cir. 1967). That case is also inapposite, see note 21, *infra*.

17. Section 4886 of the Revised Statutes, which then permitted a two-year period between public use and filing, read as follows:

> "Any person who has invented or discovered any new and useful art, machine, manufacture or composition of matter, or any new and useful improvement thereof, not known or used by others in this country, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, and not in public use or on sale for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceedings had, obtain a patent therefor."

The two-year period was reduced to one year in 1939, 53 Stat. 1212.

was a public use." 107 U.S. 90, 96, 2 S.Ct. 73, 78, 27 L.Ed. 367.

See also 2 Walker, Patents, 684–685 (Deller's 2d ed. 1964) and cases cited therein.

■ A mechanical improvement, such as the addition of screw-threads to a solid conical bolt, may give a later device "novelty" even though it does not embody "invention."[18] Mere novelty, however, does not qualify an improvement for patent protection. The question here is whether the limitation prescribed by § 102(b) begins to run from the date of disclosure of the basic invention or of the novel improvement.

■ If we ignore 35 U.S.C. § 103 for the moment and confine our attention to the language of § 102(b) and its statutory antecedents, we find solid support for the conclusion that public disclosure of an invention more than a year before a patent application is filed forecloses patentability, not only of the precise embodiment disclosed, but also of subsequent novel improvements unless such an improvement is itself patentable as an invention.

■ Section 102(b), like its predecessors, refers to disclosure of the "invention." The purpose of the statute is to require the inventor to exercise diligence in filing his patent application,[19] and to prevent him from extending the period of his limited patent grant by means of successive minor improvements, each arguably supporting a new claim on the original invention.[20] In addition, it provides a fixed date, often more readily ascertainable than the date of the invention, for evaluating the significance of prior art and resolving issues of priority. The purposes of the statute would be largely frustrated if the limitation bar could be tolled by the development of improvements which, though novel, represent no advance over the basic conception.

Presumably for that reason, the courts which have actually had to decide cases arising under § 102(b) have uniformly rejected the "strict identity" test implicitly suggested by the language of § 103. The leading case is the decision of the Court of Customs and Patent Appeals in Application of Foster, 343 F.2d 980, 52 CCPA 1808 (1965), cert. denied, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307, which has been followed by the Third Circuit in Package Devices, Inc. v. Sunray Drug Co., 432 F.2d 272 (1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239. The Ninth Circuit reached a comparable result in Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449 (1966), cert. denied, 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972; that case is of particular significance because the court expressly noted, and considered inapplicable, its earlier *dicta* concerning § 102(a).[21] Finally, we cite with approv-

18. On the other hand, a new use for the old bolt could involve invention, but a patent could not be obtained on the bolt itself because it would lack novelty.

19. "The evident purpose of the section was to fix a period of limitation which should be certain, and require only a calculation of time, and should not depend upon the uncertain question of whether the applicant had consented to or allowed the sale or use. Its object was to require the inventor to see to it that he filed his application within two years from the completion of his invention . . . . The right of an inventor to obtain a patent was in this respect narrowed, and the rights of the public as against him were enlarged, by the act of 1839." Andrews v. Hovey,

123 U.S. 267, 274, 8 S.Ct. 101, 105, 31 L.Ed. 160.

20. "There are few machines, probably, which are not susceptible of further development and improvement, and the ingenuity of mechanics and inventors is commonly on the alert to discover defects and invent remedies." Smith and Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 265, 8 S.Ct. 122, 130, 31 L.Ed. 141.

21. Plaintiff cites Ceramic Tilers Supply, Inc. v. Tile Council of America, Inc., 378 F.2d 283 (9th Cir. 1967) as overruling *Honcor* without citing it. We reject plaintiff's inference. *Ceramic Tilers* refers to "anticipation" but does not specify whether § 102(a) or § 102(b) is involved. Furthermore, it remands for reconsidera-

al the analysis of the issue in Dix-Seal Corp. v. New Haven Trap Rock Co., 236 F.Supp. 914, 916–920 (D.Conn. 1964).

In his recent opinion for this court analyzing the effect of § 102(a) and § 102 (b) on the inventor's own prior art, Judge Duffy quoted the following statement from *Dix-Seal:*

> " 'Once the year in which to prepare and file his application has passed, the employment of a standard of patentability less stringent against the first inventor than against . . . others would seem to impair, if not defeat Congressional policy. There should be no distinction between prior art of the inventor's own making and that of others.' "

See Illinois Tool Works, Inc. v. Solo Cup Company, Inc. (7th Cir. Jan. 26, 1972, No. 18960 p. 5.) Later in his opinion Judge Duffy stated:

> "The balancing process between the encouragement of technological advancement by the granting of legal monopolies and permitting a one-year grace period for application, and the interest of the public in having new advances readily accessible, has been considered by Congress in Section 102 (b). The policy to expedite free public use and public disclosure by inventors was the overriding consideration of Congress in passing Section 102(b), which expressly bars an inventor who does not file an application within one year after his invention has been in public use.

> "Once in public use, that invention becomes prior art and as to all later discoveries in that field *anyone else* must show some "patentable" change

to obtain the legal monopoly. Once the year in which to prepare and file this application has passed, the employment of a standard of patentability less stringent against the first inventor than against these others would seem to impair, if not defeat, congressional policy." *Id.* at p. 9.

If the language of § 103 were read to incorporate a strict identity test into § 102(b), it would *tear a significant hole in* the fabric of pre-1952 patent law. No intent to create such a loophole is evident from the legislative history of the 1952 Code. Neither the purpose of the codification as a whole,[22] nor the specific reasons for the inclusion of § 103,[23] have any application to the issue presented here.

■ Section 103 was intended to articulate a standard of invention somewhat less strict than that implied by reference to an inventor's "flash of creative genius" and also to remind us to judge patentability against the state of the art at the time the invention was made without benefit of hindsight predicated on subsequent art. The section, however, made no basic change in preexisting law. See Graham v. John Deere Co., 383 U.S. 1, 12–17, 86 S.Ct. 684, 15 L.Ed.2d 545.

■ Nevertheless, § 103 does shed this much light on § 102(b). Its use of the concept of "nonobviousness" to identify the level of invention which qualifies for patent protection should also govern the interpretation of the word "invention" in § 102(b). And its admonition to judge the issue in the correct temporal context requires us to determine whether the subsequent developments should have been obvious at the time the disclosure was made, rather than at the later date when the improvement was dis-

---

tion of § 103 obviousness, and gives no indication that there was any filing date issue which would have presented a § 102 (b) obviousness problem. If the case had presented such a problem, we are confident that the court would have cited and discussed its prior opinion squarely deciding the point.

22. See Frederico, Commentary on the New Patent Act, reprinted in 35 U.S.C.A. at p. 6.

23. See Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 271–272 (2nd Cir. 1967) (Kaufman, J., concurring and dissenting).

covered.[24] The factual issue under § 102 (b) presented to the district court in this case was, therefore, whether the subject matter of the '612 claims should have been obvious to a person having ordinary skill in the art on June 19, 1959.[25]

### B. Sufficiency of the Findings.

Plaintiff contends that the district court's analysis of the obviousness question failed to follow the procedure mandated by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545.

The first step, a determination of the relevant prior art, merely required attention to the sale door itself and contemporaneous documents which were received in evidence. The relevant prior art was adequately identified.

The district court next considered the differences between the sale door and the '612 claims. He attached no significance, and neither do we, to the fact that the "J" configuration of flanges was found in only three horizontal rails in the sale door. Even if the concept had been disclosed in only one, that would have sufficed. Similarly, the fact that the configuration of flanges, followed by the insertion of the plastic panel and the application of pressure to the shorter flange,

was intended both to secure the panel in the frame and also to make the door watertight was evident from the door itself.[26] Of course, the application of greater pressure would better achieve these purposes: it would reduce the possibility of leakage and the need for rivets.[27]

The district court specifically found that the shorter flange in the sale door was not embedded in the plastic panel. He found that "the only genuine difference between the door sold on June 19, 1959, and the mechanical patent here in issue is the degree of rolling force utilized." A. 412. Although it might have been more precise to state the difference in terms of the consequence of the application of greater force, we believe this finding was clearly correct and adequately identified the differences between the "prior art" and the claims at issue as required by the second step of the *John Deere* procedure.

■■■ The district court made no findings which expressly discuss "the level of ordinary skill in the pertinent art," but he did unambiguously find that the attainment of embedment was merely the result of "mechanical skill." We are therefore satisfied that his ultimate find-

24. In some cases the obviousness issue under § 102(b) would involve consideration of "prior art" which was actually subsequent to the date of invention. See, e. g., Application of Foster, 343 F.2d 980, 52 CCPA 1808 (1965), cert. denied, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307. In this case, however, the discovery which is claimed as an invention in the '612 patent purportedly came after the public sale on June 19, 1959.

25. Since the sale door is clearly prior art with respect to the '612 patent, Illinois Tool Works, Inc. v. Solo Cup Company, Inc., *supra*, it would also be considered if patentability were to be judged under § 103 "at the time the invention was made."

26. Plaintiff states that the '699 patent "describes exactly and accurately the very door sold by plaintiff on June 19, 1959." Both the holding and the waterproofing functions are described therein:

"Preferably the edges of the flanges 154 are rolled down tightly against the associated plastic panel 54 after assembly. This prevents water from being pulled by capillary action over the top of the plastic panel 54 to the inside of the door." Patent '699, column 9, lines 9–13.

At lines 12–16 of column 12 there is reference to the horizontal rails "having a pair of spaced-apart holding flanges adjacent to the front edge thereof extending substantially the length thereof toward the other horizontal rail and snugly receiving and holding the adjacent panel flange, . . . ."

27. The claims of the '612 patent do not refer to the elimination of rivets. Moreover, plaintiff's improved model, embodying the '612 "invention," used some rivets to secure the panel to the frame.

ing that the attainment of embedment "did not constitute invention" adequately complied with the requirements of *John Deere,* and that his findings are supported by the record.

## III.

Plaintiff contends that if the improvement claimed in the '612 patent was obvious from the sale door, it is entitled to the benefit of the filing date of the '699 application which allegedly described that door "exactly and accurately."

■ If a later patent application satisfies the four conditions specified in 35 U.S.C. § 120, it is entitled to the benefit of an earlier filing date.[28] The '612 application appears to satisfy three of these conditions.[29] The question is whether the invention claimed in the '612 patent was disclosed in the '699 application "in the manner provided by the first paragraph of [35 U.S.C. § 112]."

The '699 application disclosed the basic invention, including the "J" configuration of the flanges on the horizontal rail. It did not include any drawings illustrating the effect of applying sufficient force to embed the shorter flange into the plastic panel—that is, to change the configuration from a "J" into a fishhook. But as the district court found, that modification should have been obvious to a person having ordinary skill in the art. It is therefore not unreasonable for plaintiff to argue that its earlier application should have satisfied the disclosure condition in § 120.

That section, however, requires the prior disclosure to satisfy the first paragraph of § 112. That paragraph prescribes the kind of disclosure which shall be contained in the specification in a patent application.[30] It says nothing about the device itself, or what might be obvious from its inspection, use or manufacture. For that reason, notwithstanding the superficial plausibility of plaintiff's argument, it actually confuses two quite different issues.

■ Under § 102(b) the defendant had the burden of proving that the subject matter of the '612 claims was obvious from the sale door itself, together with the evidence respecting the state of the art on June 19, 1959. Under § 120, however, the plaintiff had the burden of proving that the '699 specification adequately disclosed the best mode contemplated by the inventor for carrying out the invention claimed in the '612 patent. Important evidence supporting the find-

28. "To come within the purview of Section 120, the later application must 1) disclose an invention disclosed in the manner provided in 35 U.S.C.A. § 112 in an earlier application; 2) be by the same inventor; 3) be filed before the patenting of the earlier application; and 4) contain a specific reference to the earlier application." Bendix Corp. v. Balax, Inc., 421 F.2d 809, 817 (7th Cir. 1970), cert. denied, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562.
Section 120 reads as follows:
"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

29. Defendant argues that the cross-references to the '699 application were insufficient because not contained in the first sentence of the specifications as required by Rule 78(a) of the Patent Office Rules. We do not pass on the validity of this argument.

30. The first paragraph of § 112 reads as follows:
"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

ing of obviousness, and therefore the § 102(b) defense, sheds no light whatsoever on the § 120 issue.

The '699 specification contains no reference to the portion of the aluminum flange which is actually embedded into the compressible panel. This part of the flange was carefully described in the '612 specification [31] and identified as the "gripping member" on the '612 drawings.[32] The gripping member is one of the elements of the combination claimed in the '612 patent.[33]

Certain evidence relating to the gripping member supported the district court's finding that the embedment concept was obvious on June 19, 1959. That evidence, though apparently available to the plaintiff before the '699 application was filed, finds no counterpart in the '699 specification.

The evidence included a memorandum indicating that on June 1, 1959, plaintiff had started work on a new machine to roll the flanges into the fiberglass panels [34] and an apparently contemporaneous pair of drawings closely resembling the actual configuration of the flanges in the frame of the sale door before and after the application of pressure.[35] These drawings strongly suggest, and may actually disclose, the concept of embedment.[36] It was entirely proper for the district court to determine the issue of obviousness under § 102(b) on the basis of his study of not only the sale door itself but also the contemporaneous evidence indicating that embedment would result from the application of additional pressure to the front flange.

There is no inconsistency between his finding of obviousness based

---

31. For example:
 "Referring to FIG. 3 of the drawing it is further seen that the second holding flange 154 has a beveled surface 156 facing the flange 152, the beveled surface 156 being disposed at an angle of approximately 35° with respect to the wall 160 of the flange 154 disposed toward the flange 152. The junction 158 between the surface 156 and the wall 160 provides a gripping member for engaging the associated flange 56 of the panel 54 as is best seen in FIG. 4 of the drawings. More particularly, in assembling the panel 54 to the rail 140, the flange 56 is placed between the holding flanges 152 and 154 and the flange 154 is bent over or deformed such as by rolling whereby to push the outer edge of the flange 154 toward the flange 152 thereby causing the gripping member 158 to be placed against and partially embedded in the panel flange 56 thereby to press the other surface of the flange 56 against the first holding flange 152, so that the panel flange 56 is securely gripped and held between the holding flanges 152 and 154. The penetration of the gripping member 158 into the flange 56 is made possible by forming the rail 140 of a material that is harder than the plastic panel 54 and to this end the rail 140 is formed of a malleable metal, the preferred material being aluminum." Column 3, line 65 through column 4, line 13.

32. See No. 158 in figures 3 and 4 and Nos. 266 and 268 in 6 and 7 (A. 512).

33. The last portion of claim 1 reads as follows:
 " . . . said first and second holding flanges being formed of a material having a hardness greater than that of said panel flange, and a gripping member on said second holding flange disposed toward said flat surface on said first holding flange and being pressed into and embedded in said panel flange and urging said panel flange against said flat surface on said first holding flange, whereby to form a strong and continuous and watertight joint between said gripping member and said panel flange." Column 5, lines 62–71.

34. Plaintiff's trial exhibit 24 contains the June 1, 1959, date. A copy of the same work order submitted to the Patent Office as supporting evidence for establishing the date of invention as prior to August 24, 1959, did not reveal the June 1, 1959, date which, of course, might have put the Patent Office on notice that a potential problem under § 102(b) was present.

35. A. 635.

36. Indeed, figures 3 and 4 in the '612 patent almost duplicate the drawings which are associated with the June 1, 1959, work order.

on that evidence and his rejection of plaintiff's untimely contention that the invention claimed in the '612 patent had been disclosed in the '699 specification in the manner prescribed by the first paragraph of § 112. It is conceivable that elements such as the gripping member, the importance of a relatively hard flange on the horizontal rail,[37] and actual embedment, which were painstakingly described in the '612 specification, were inherently disclosed by the '699 application, but that conclusion is by no means obvious. *Cf.* Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 57–59, 59 S. Ct. 8, 83 L.Ed. 34. In view of the omission from the '699 application of drawings which had previously been prepared,[38] and which disclosed the invention in substantially the same manner as drawings used in the '612 specification, it is extremely doubtful that plaintiff made the full disclosure—including "the best mode contemplated by the inventor of carrying out his invention"—required by the first paragraph of § 112.

■ Even if there might be merit in plaintiff's post-trial assertion that the '612 patent should have the benefit of the '699's filing date, it is clear that the issue presented by the belated argument could not have been resolved summarily in plaintiff's favor. It is equally clear that plaintiff could have advanced this

argument as an alternative contention as soon as defendant pleaded § 102(b) as a defense. The district court properly exercised its discretion in refusing to reopen the case to give plaintiff a second chance to try to establish the validity of its patent.

We doubt that plaintiff's '699 specification disclosed the invention claimed in the '612 patent in the manner required by § 112. This doubt buttresses our holding that plaintiff's election to try the case on the theory that the differences between the sale door and the '612 claims provided an adequate response to the § 102(b) defense, without relying on § 120 as an alternative contention, forecloses any challenge to the district court's summary rejection of plaintiff's post-decision attempt to inject new issues into the case.

### IV.

The patented design is reproduced in the margin.[39] There is no novelty in the fact that the door is comprised of four sections composed of a corrugation of alternate broad planes and narrow grooves. Three other features were stressed in supporting allowance of a patent: (1) the entire garage door is surrounded by a narrow border; (2) the broad plane surfaces in the corrugation are substantially equally spaced; and (3) every third

---

37. See footnotes 31 and 33, *supra*.

38. The '699 application was filed on August 19, 1959; the drawings were definitely prepared before August 24, 1959, and the inference that they were prepared in connection with the June 1, 1959, work order is reasonable. The drawings, as well as the June 1, 1959, work order, were submitted as exhibits to an affidavit filed with the Patent Office to establish an invention date prior to August 24, 1959; in the Patent Office file wrapper the dates of both documents are omitted.

39. A front view of the garage door showing the patented design is depicted in figure 1 of the patent (shown here). The depth and angles of the corrugation are shown in a vertical sectional view in a separate figure in the patent.

[A5408]

plane is bisected by the horizontal bars which hinge two sections together.[40]

The prior art submitted to the Patent Office Examiner included catalog references and mechanical patents, but no design patents. He rejected the application on the ground that the design lacked invention.[41] In response to a request for reconsideration, the Examiner again concluded that the design did not present "anything patentably ornamental" and finally rejected the claim as lacking invention.[42]

The Board of Appeals reversed the Examiner's rejection. It held that the three features identified above produced "a design which is not similar to or suggested by the references."[43] Its opinion adequately explained why plaintiff's design was novel, but does not expressly consider the requirement of "invention."

The district court found the design patent valid and infringed. The court expressed the opinion that the design satisfied the test of "creative originality in artistry."[44] In reaching this conclusion the court expressly relied on the presumption of validity[45] and the appearance of the exposed aluminum at the hinges.[46]

Defendant's denial of infringement was predicated on the fact that the sections of its door are hinged in the narrow grooves which separate the broader planes instead of bisecting every third broad surface. The district court concluded, however, that the overall appearance of the two doors was substantially identical because on both doors the hinges were almost entirely concealed. The court also stated, erroneously, that the Patent Office Board of Appeals placed no reliance on the location of the hinges.[47]

In order to support its claim of infringement, plaintiff construed the scope of its monopoly grant as broadly encompassing doors with substantially equally spaced grooves surrounded by a narrow border, regardless of whether the hinging horizontal framing members bisect a broad surface or a narrow groove. As so construed, we hold that the patent is not supported by a presumption of validity because we do not think the Board of Appeals' decision can be read as giving the plaintiff the monopoly it asserts.

---

40. In the file wrapper the word "groove" is sometimes applied to the broad surfaces rather than to the narrow indentations which separate them. Thus, in its description of the design, the patentee stated: "The claimed design is characterized by a relatively narrow border extending completely therearound with major horizontal grooves substantially equally spaced with every third groove in turn being bisected by a definite horizontal framing member." A. 776.

41. In his rejection dated October 29, 1959, the Examiner twice stated that the design was "lacking in invention." A. 773.

42. The final rejection dated January 27, 1961, appears at A. 793–794.

43. The Board of Appeals' opinion concludes as follows:
"In our opinion, appellants' arrangement of a plurality of narrow, vertical side frames on each side of the door, together with the arrangement of the horizontal panel members and the relatively large grooves therebetween, *as*

*well as the horizontal arrangement of the hinge sections at the end of each of the vertical side frames and intermediate certain of the horizontal panels together,* as a whole, produces a design which is not similar to or suggested by the references." (Emphasis added.) A. 810.

44. See Burgess Vibrocrafters v. Atkins, 204 F.2d 311, 313 (7th Cir. 1953).

45. The court felt that the presumption of validity was strengthened by what it described as "the lengthy litigation in the Patent Office." A. 414.

46. The court stated in part: "The Frantz door, *by the use of narrower strips of exposed aluminum at the hinges,* wider fiberglass projections in relation to the grooves, and more shallow grooves, creates a significantly different appearance." (Emphasis added.) A. 415.

47. See the emphasized portion of the quotation from the Board of Appeals' opinion quoted in footnote 43, *supra.*

Without that support we think the Examiner was clearly correct in finding that the design was lacking in invention.

There are several reasons for our conclusion that the monopoly claimed by plaintiff is not presumptively valid. We first note that a patented design, like the subject matter of a mechanical patent, must embody invention. The purpose of the statute is to reward, and thereby to encourage, creative artistic activity rather than mere changes of detail which may produce "novelty" but do not reflect "invention." The inventor must make a "contribution to the public which the law deems worthy of recompense." Gorham Company v. White, 14 Wall 511, 81 U.S. 511, 525, 20 L.Ed. 731.[48]

In this case the Examiner plainly and repeatedly expressed his judgment that the claimed design was lacking in invention. The Board of Appeals' opinion carefully articulated differences between plaintiff's design and the specific prior art references to support its conclusion that the design was novel, but the opinion contains no comment on the separate and important requirement of invention.[49]

If we read into the opinion a finding that the design reflects creativity, significance must be attached to the Board's express reference to the hinging horizontal framing members which bisect every third broad surface. Since a more normal location for the hinges would be in the narrow grooves, greater originality is reflected in this feature than in either the narrow border or the roughly equal spacing of grooves. A construction of the patent which eliminates this feature, therefore, removes any basis for presuming that the Board of Appeals *sub silentio* found that plaintiff's otherwise commonplace design did attain the status of invention.

We therefore conclude that the design patent, as construed by plaintiff, is clearly lacking in invention, as the Examiner found.[50]

The judgment of the district court is affirmed insofar as it holds Patent No. 3,169,612 invalid; insofar as it holds Design Patent No. 194,094 valid and infringed, it is reversed.

48. The source and purpose of the statutory monopoly must be kept in mind.

"An author's 'Writing' or an inventor's 'Discovery' can, in the constitutional sense, only extend to that which is his own. It may not be broadened to include matters within the public domain. The congressional power to grant monopolies for 'Writings and Discoveries' is likewise limited to that which accomplishes the stated purpose of promoting 'the Progress of Science and useful Arts.'" Lee v. Runge, 404 U.S. 887, 890, 92 S.Ct. 197, 199, 30 L.Ed.2d 169 (Mr. Justice Douglas dissenting from denial of certiorari).

49. "Although there are cases indicating that a lower degree of inventive ability will support a design patent than will support a mechanical or utility patent, the weight of authority is clearly that the standard of invention required for design patents is the same as for other patents." 2 Walker, Patents, 775 (Deller's 2d ed. 1964).

50. Under a narrower construction of the patent emphasizing, as the "inventive" concept, the hinge location and appearance, defendant's door clearly would not infringe. We thus need not squarely decide if the design patent as narrowly construed would be valid. That this conclusion is doubtful given the standards necessary in order to meet the "invention" criterion of design patents can be seen from examining the design patent cases decided by this court, which are conveniently collected in Judge Hastings' comprehensive footnote in Amerock Corp. v. Aubrey Hardware Mfg., Inc., 275 F.2d 346, 349 n. 1 (7th Cir. 1960). See also two subsequent cases, Day-Brite Lighting, Inc. v. Sandee Mfg. Co., 286 F.2d 596 (7th Cir. 1961); Day-Brite Lighting, Inc. v. Compco Corp., 311 F.2d 26 (7th Cir. 1962), reversed on other grounds, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669.