**TRIO PROCESS CORPORATION,**
Appellant in No. 71–1295,

v.

**L. GOLDSTEIN'S SONS, INC.,**
Appellant in No. 71–1296.

Nos. 71–1295, 71–1296.

United States Court of Appeals,
Third Circuit.

Argued March 24, 1972.

Decided May 22, 1972.

Thomas M. Ferrill, Jr., Blue Bell, Pa. (Roger Norman Coe, Philadelphia, Pa., on the brief), for Trio Process Corp.

Nelson E. Kimmelman, Necho & Kimmelman, Philadelphia, Pa., for L. Goldstein's Sons, Inc.

Before SEITZ, Chief Judge, and ADAMS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this patent infringement case, we must first determine the validity of United States Patent No. 3,076,421, issued to Albert W. Spitz (Spitz) and owned by Trio Process Corp. (Trio), and

then decide whether the district court's finding of willful infringement is correct.

The primary issue of validity is whether the process disclosed in the patent was obvious to a practitioner with ordinary skill in the appropriate art at the time the process was developed. The infringement issue can be resolved by determining whether Trio is precluded by "file-wrapper estoppel" from asserting the doctrine of equivalents to show infringement.

## THE PATENT

The patent which forms the subject matter of this case teaches a process of removing organic insulation from scrap wire. The method basically consists of the following steps:

1. Igniting a pile of scrap wire and organic insulation;

2. Superimposing a bottomless combustion chamber over the ignited pile;

3. Admitting air at a limited rate to the ignited pile and simultaneously air-cooling the outside of the combustion chamber so that the temperature of the ignited pile remains below the melting point of the wire;

4. Passing the products of the combustion—smoke and hydrocarbon gases—through an afterburner, into which is added fuel and air, so that the smoke and gases will be substantially oxidized.

The device disclosed in the patent by which the process may be practiced consists of a portable, sheet-metal conical combustion chamber upon which a refractory-lined afterburner is superimposed.[1] Bunsen burners are suggested for introducing air and fuel into the afterburner chamber. A frame supports the afterburner. The frame also provides a point for attachment to a crane so that the furnace may be lifted, carried to the site of the scrap wire, and then lowered over such wire.

## FACTUAL BACKGROUND

For the past several decades, there has been an increasing demand for nonferrous metals, including copper, for the electrical and other industries. To meet this demand, newly-mined metals are supplemented with metals reclaimed from scrap sources. Before scrap wire can be reclaimed, however, it is necessary to remove the insulation covering such wire.

Prior to the development of the method set forth in the Spitz patent, two procedures were utilized to remove insulation from scrap wire. One such method was to burn the wire in an open field. This procedure was inefficient and uneconomical as it required that the wire be raked back and forth to achieve proper burning, and did not provide satisfactory control over the oxidation and melting of the wire.[2] It also contributed to air pollution by releasing smoke and other gases into the atmosphere. The other process involved the rapid burning of scrap wire at high temperatures in forced draft, stationary furnaces. These fixed furnaces were expensive to build and difficult to use because the wire had to be prepared for burning and then transported to the furnaces. Moreover, the reclaimed metal would have to be removed from the furnace before it could become oxidized or melted. Both methods required substantial manpower for their effective utilization.

In late 1957, Spitz undertook an assignment from Franklin Smelting & Refining Company to develop an effective method of removing insulation from wire. Spitz investigated the procedures currently in use, devised a fixed furnace that could be charged from the top and unloaded from the bottom, and finally developed a concept converse to that previously employed, namely, the burning of

---

1. To a layman, the furnace resembles a huge, inverted funnel. An illustration of Spitz's furnace is reproduced in the Appendix to this opinion.

2. It is important to control oxidation because excess oxidation can materially affect the physical properties of the metal.

the insulation in a portable furnace at a low temperature to be controlled by limiting the availability of air. Spitz's development had several advantages over the prior procedures: It reduced material handling costs, it diminished air pollution, and it efficiently produced No. 1 grade copper scrap inexpensively by a method which could be operated by relatively untrained personnel.

Spitz applied for a patent in October of 1958. The original application contained both apparatus and method claims. All of the claims were rejected by the examiner on the basis of prior art.[3] In 1959, the application was amended, but the new claims were also rejected.[4] The apparatus claims were amended in 1960, and new method claims were added to the application. Once more, the apparatus claims were disallowed on the basis of prior art, and the method claims were rejected as being misdescriptive[5] in that they provided for superimposition of the furnace prior to ignition of the scrap, whereas the patent disclosure specified ignition before the furnace was lowered into place. After further amendment and abandonment of the apparatus claims, the patent containing method claims issued on February 5, 1963.

Early in 1959, L. Goldstein's Sons, Inc. (Goldstein) became aware of the Spitz method and tried to emulate it, probably because Goldstein found the other two methods of processing scrap wire, described at p. 68, *supra,* unsatisfactory. Goldstein hired first one, then another engineer to attempt to duplicate the Spitz process, but although these engineers observed the Spitz furnace in operation, they were unable to devise a similar procedure. One of the engineers recommended a wire-chopping process which was eventually adopted for the reclamation of aluminum wire.[6] In November, 1959, Goldstein sought the opinion of a patent attorney as to the patentability of the Spitz furnace. The attorney advised that the furnace was not patentable. Goldstein did not seek an opinion as to the validity of the patent after its issuance in 1963.

In 1960, Goldstein obtained licenses from Trio to use Spitz's method to process scrap wire.[7] Trio applied for and obtained on Goldstein's behalf appropriate permits from the City of Philadelphia. Spitz subsequently approached Goldstein in late 1964 and early 1965 to determine if it had any interest in additional furnaces. Goldstein stated that it had no interest, ostensibly because there was no room at its plant for the installation of additional furnaces. In actuality, Goldstein had engaged a metal fabricator to copy the Spitz furnace. Several of these copies were installed in Goldstein's Philadelphia facility,[8] and one

---

3. Prior art has been defined as follows: "The existing state of knowledge in a particular art at the time an invention is made. It includes the issued patents * * *, publications, and all other knowledge deemed to be common thereto such as trade skills, trade practices, and the like." A. Smith, Patent Law, Cases, Comments and Materials 2 (1964).

4. The basis of the rejection of the new claims was that the apparatus was obvious in view of the prior art, and that the method claims were improper in that they relied on specific aspects of the apparatus and were disclosed in the prior art.

5. A claim is considered misdescriptive when it is not literally supported by the language of the specification or disclosure contained in the patent.

6. Goldstein's research continued through 1965, but apparently was never successful.

7. Licenses were also obtained by Franklin Smelting in Philadelphia, AMA Metal Company in New York, Minkin Metal Company in Michigan, Luria Brothers, Inc. in Pennsylvania, and Phelps Dodge in Arizona.

8. Applications for permits filed by Goldstein with the air pollution control section of the Philadelphia Department of Health specifically recite that each furnace to be installed by Goldstein is identical to an incinerator which was previously licensed by the Department of Health. The previously licensed incinerator was in fact a furnace provided by Trio.

was sent to AMA Metal Corporation, which had been acquired by Goldstein. Spitz endeavored to obtain clarification of Goldstein's position, and when an unsatisfactory answer was received, Trio charged Goldstein with patent infringement. Although Trio offered licenses for the additional furnaces installed by Goldstein, the offer was refused and Goldstein terminated the license agreement.

In May, 1969, Trio filed suit against Goldstein for willful patent infringement, contributory infringement, and unfair competition. Goldstein's answer denied infringement and asserted as an affirmative defense that the patent was invalid under 35 U.S.C. §§ 101, 102, 103 and 112. After a trial without a jury, the patent was held to have been willfully infringed, but invalid as obvious under 35 U.S.C. § 103. The district court did not rule on the issue whether the patent was invalid under 35 U.S.C. § 112. Trio appealed from the holding of invalidity and Goldstein cross-appealed on the issue of infringement.

### VALIDITY OF THE PATENT

We begin this discussion with the pole star proposition that a patent is presumed to be valid and that the burden of proof is on the party alleging invalidity.

■ Congress provided in 35 U.S.C. § 282 (1970), that: "A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it." And this Court has recognized that " * * * the burden of proving invalidity in the face of the presumption is a heavy one." Schmidinger v. Welsh, 383 F.2d 455, 462 n. 10 (3d Cir. 1967); cert. denied, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968). Indeed, invalidity must be demonstrated by clear and convincing proof, Ever-

Wear Inc., v. Weiboldt Stores, Inc., 427 F.2d 373 (7th Cir. 1970); General Foods Corp. v. Perk Foods Co., 419 F.2d 944 (7th Cir. 1969), cert. denied, 397 U.S. 1038, 90 S.Ct. 1537, 25 L.Ed.2d 649 (1970); Moon v. Cabot Shops, Inc., 270 F.2d 539 (9th Cir. 1959), cert. denied, 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960).

Because of the special public interest surrounding the issue of patent validity,[9] we have carefully evaluated the record and the district court's findings and conclusions with the above stated precepts in mind.

#### A. Obviousness

As stated above, the district court held that the patent was invalid on the ground that the invention was "obvious." Section 103 provides, in pertinent part: "A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * * "

Although Section 103 was enacted in 1952, it was not until 1966 that the Supreme Court definitively construed it in a trilogy of cases. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Calmar, Inc. (Colgate-Palmolive Co.) v. Cook Chemical Co., id.; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In Graham, the Supreme Court set forth the primary tests and secondary criteria for determining obviousness:

"[T]he scope and content of the prior art * * *; differences between the prior art and the claims at issue * * *; and the level of ordinary

9. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Royal Typewriter Co. v. Remington Rand, Inc., 168 F.2d 691, (2d Cir.), cert. denied, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948); see generally, Note, In Rem Validity— A Two-Sided Coin, 59 Geo.L.J. 73, 80–81 (1970).

skill in the pertinent art * * *. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." 383 U.S. at 17, 86 S.Ct. at 694.[10]

The *Adams* case illustrates that where all the elements of an invention were known in the prior art but not utilized together, if the combination of the elements produced unexpected results different from the prior art, an invention may be patentable, particularly where the prior art indicates that the procedure utilized by the patent will be unproductive. 383 U.S. at 50–52, 86 S. Ct. 708, *accord* D. Dunner, J. Gambrell, & I. Kayton, Patent Law Perspectives, Current Service, at A.5 (1966–67 Annual Review).

Trio maintained that because the district court did not specifically make the three primary findings referred to in *Graham,* reversal is required. But *Graham* and *Anderson's Black Rock* do not require that the three primary findings be made, but rather, only that the three primary tests be considered in the findings made by the district court. *See* Frantz Mfg. Co. v. Phenix Mfg. Co., 457 F.2d 314, 322 (7th Cir. 1972). Here, the trial judge's findings indicate that the scope of the prior art includes the reclamation of scrap wire, the manufacture of charcoal, the control of air pollution, and the incineration of tree stumps and sawdust. The content of the prior art was found to include portable furnaces, fixed furnaces, conical furnaces, and afterburners. The analysis of the prior art performed by the district court

clearly highlights the differences between the claims at issue and the prior art as well as the similarities.

Although it would have been preferable for the trial judge to have set forth his findings with regard to the ordinary level of skill in the pertinent art with greater specificity, the findings actually made indicate that an ordinary person skilled in the art would be aware of the use of fixed furnaces operated at high temperatures to process scrap wire, the use of portable furnaces operated at low temperatures with limited air to produce charcoal, and the use of afterburners to cleanse the effluent gases. Furthermore, the district court made specific findings with respect to the needs of the industry and the commercial success of the invention. Accordingly, we held that the district court adequately complied with the requirements of *Graham.* We have examined the record with respect to the findings of the district court discussed above, and find substantial evidence supporting them.[11]

The ultimate legal conclusion of the district judge that the patent was invalid under Section 103 carries with it the necessary implication that the differences between the invention *sub judice* and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the pertinent art. It is here that we believe the district court erred.

When the patent examiner approved the Spitz patent, he cited seven prior patents he considered to be in the prior art. These patents disclosed, *inter alia,* an apparatus and method for reclaiming

---

10. With regard to the primary tests, the Supreme Court has "admonished that 'strict observance' of those requirements is necessary." Anderson's Black Rock, Inc. v. Pavement Salvage Company, Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

11. Trio has assigned as error the admission into evidence of the opinion testimony of Dr. Edward Adler on the ground

that he was not qualified under the rule of Arnold v. Loose, 352 F.2d 959 (3d Cir. 1965), to testify as an expert. However, Trio has not indicated in what manner such testimony prejudiced it. In any event, even excluding such testimony, the evidence in the record is sufficient to support the findings of the trial judge. Therefore, the error, if any, was harmless under Rule 61, Fed.R.Civ.P.

copper wire,[12] an afterburner to deodorize effluent gases,[13] an apparatus for the odorless burning of refuse,[14] a portable conical incinerator for burning tree stumps,[15] and a portable charcoal kiln which disclosed the concept of limited access of air.[16] Despite these references, the examiner concluded that the invention was unobvious, and such conclusion is presumptively correct.

■■ To rebut this conclusion, Goldstein cited eight additional patents and three literature references. In holding the patent invalid, the district court relied on five of the patents that were before the examiner (discussed *supra*), four of the patents cited by Goldstein,[17] and the three literature references.[18] A careful reading of the patents and literature reference cited by Goldstein indicates that they are merely cumulative to the references before the examiner. As such, they add no new material from which the district court could conclude that had the examiner read them, he would have held that the invention was unpatentable for obviousness. None of the references cited by the district court, individually or taken as a whole, indicate that organic insulation can be burned in a commercially feasible manner from scrap wire at low temperature without oxidizing or melting the wire.[18a] And even when all the references are viewed in conjunction with all the testimony taken at the trial, the evidence still falls short of "clear and convincing" proof that the method disclosed by the patent would have been obvious to a person with ordinary skill in the relevant art at the time Spitz developed his process. This is particularly so where, as here, the prior art indicates that high-temperature burning, rather than the low-temperatures employed by Spitz, is a more advantageous means of accomplishing the intended result. United States v. Adams, *supra*.

■ Goldstein argues, however, that the method patented by Spitz was obvious at the time the invention was made because each of the steps described in the Spitz claims was well known in the prior art. However, the essence of the Spitz invention did not lie in the individual steps, but rather, con-

12. Wilkins Patent No. 2,815,278, teaching the use of a high temperature furnace with an afterburner.

13. Breitweiser Patent No. 1,773,256.

14. Cummings Patent No. 1,528,816.

15. Morgan Patent No. 1,082,644.

16. Lovelace Patent No. 266,850.

17. Edwards Patent No. 292,635 (conical charcoal oven; slow combustion); Kurre Patent No. 245,179 (stump burner); Middaugh Patent No. 1,199,403 (sawdust burner designed for rapid burning utilizing air-cooling to prevent overheating); Cassity Patent No. 1,126,388 (stump burner).

18. Two of the literature references concern the use of afterburners to reduce air pollution; the third refers to refuse burning in apartment house incinerators and teaches both the use of an afterburner and the control of air in the combustion chamber to reduce pollution.

18a. It could be argued that it would be obvious to a person with ordinary skill in the art of wire reclamation to burn the insulation from wire at a temperature lower than the melting point of the wire, and that once this solution were arrived at, the method would be obvious in view of the prior art. Although this argument has superficial appeal, it is not supported by the facts of this case. Indeed, Goldstein, after being apprised of Spitz's concept, was still unable to reduce it to practice, prior to the issuance of the patent, without first obtaining instruction from Trio.

In any event, invention might lie in the realization of the exact problem to be solved. When the identification of the problem is not obvious, the invention can be patentable, even though the solution to the problem would then be obvious. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923). *But cf.* Graham v. John Deere Co., *supra*, 383 U.S. at 25, 86 S.Ct. 684. The proper test is whether the process as a whole would have been obvious to one of ordinary skill in the art, not whether it would be "obvious to try" a certain solution to the problem at hand. In re Dien, 371 F.2d 886, 54 CCPA 1027 (1967).

sisted of combining the steps in an un-suggested manner into a process that would achieve a substantially different function and result from the other processes of which the individual stages were a part.[18b] Where such occurs the invention of a process may be patentable despite the fact that the individual phases were known in the art. *See* Shaw v. E.B. & A.C. Whiting Co., 417 F.2d 1097 (2d Cir. 1969); *cf.* Anderson's Black Rock Inc. v. Pavement Salvage Co., *supra. See generally*, D. Dunner, J. Gambrell, I. Kayton, *supra*, at Dev. A.1–3 to –7 (Developments 1970).[19] It is the subject matter as a whole which must be considered in determining obviousness. In re Wiggins, 397 F.2d 356, 55 CCPA 1356 (1968).[20]

### B. Specific disclosure

Although Goldstein asserted in its answer that the patent was invalid for failure to comply with 35 U.S.C. § 112,[21] the district court did not decide this issue. Here, Goldstein urges that the holding of invalidity may be affirmed on this ground alone. In support of its argument, Goldstein contends that Spitz did not disclose certain shortcomings of his invention, Spitz fraudulently misrepresented both the shortcomings of the prior art and the result reached by the use of his invention, the patent fails to teach the necessity to observe the presence or absence of smoke, the patent does not describe any specific temperature ranges, and that the patent does not set forth the best mode of operation.

■ With regard to the allegations of omissions and misrepresentations, we hold that, on the facts of this case, such were not material, in that they did not relate to the statutory conditions of patentability: novelty, 35 U.S.C. § 102; obviousness, 35 U.S.C. § 103; or utility, 35 U.S.C. § 101.[22] In this respect, Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592 (3d Cir. 1972), is distinguishable because there the misrepresentations directly related to anticipation (novelty), obviousness, and utility, and the patent might not have issued had full disclosure been made.

18b. The functions performed by the devices in the prior art include the manufacture of charcoal, essentially a distillation process, and the burning of refuse, such as sawdust and tree stumps a combustion process in which there is no attempt to preserve any sort of unoxidized by-product. In contrast, the function of the Spitz method is to burn insulation while preserving intact as the primary product No. 1 grade scrap wire. And it follows that here, the result is different in that the end product, scrap wire, is preserved in its original physical and chemical state, whereas the other devices produced products in which the physical or chemical state of the subject matter was substantially altered.

Examination of the two methods of producing scrap wire known in the prior art shows a facial similarity in function and result. But closer analysis demonstrates that the result of the Spitz process is not the mere production of scrap wire, but the production of such wire in a more economical manner, in that operating and material handling costs are reduced by resort to this method.

19. These citations all refer to combination apparatus patents, but the principles ap-ply equally well to a multi-step process claim.

20. The *Wiggins* opinion was written by Justice Clark, who authored Graham v. John Deere Co., *supra*.

21. Section 112 provides, *inter alia:*
"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person *skilled in the art* to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." (emphasis added)

22. Arguably, the allegation regarding the inability of the invention to cope with metal-sheathed wire or aluminum wire bears on utility, but when the misrepresentations are measured against the appropriate standards, it becomes obvious that even if fuller disclosure had been made, Spitz's process still would have been patentable.

The other Section 112 arguments relate to the lack of disclosure or vagueness of the operating parameters of the process. However, as distinguished from Section 103, dealing with obviousness, Section 112 refers to persons skilled in the art, and the disclosure must be evaluated with respect to such persons. Patent specifications need not be so detailed as "production specifications." In re Gay, 309 F.2d 769, 50 CCPA 725 (C.C.P.A. 1962).[23] Regarding the allegations that the best mode of operation was not disclosed, the statute as interpreted by the courts requires only that the best mode of operation known to the inventor at the time the application was filed be set forth. *Id.* The examiner determined that the disclosure of the patent was adequate, and a review of the record as a whole indicates that the evidence falls short of "clear and convincing" proof that the specification fails to teach a person skilled in the art how to operate the process.[24]

### C. Late claiming and Misuse

In its brief to this court, Goldstein urges that the patent should be held invalid because of late claiming under 35 U.S.C. § 132, and unenforceable because Trio misused the patent in a variety of respects. However, late claiming and misuse are affirmative defenses which must be pleaded and proved. 35 U.S.C. § 282 (1970). Because Goldstein's answer to the complaint did not raise these issues, we hold these defenses to have been waived under Rule 8(c), Fed.R.Civ.P., and need not consider them further.

### WILLFUL INFRINGEMENT OF THE PATENT

Goldstein contends that the district court's conclusion of willful infringement is erroneous as a matter of law. The evidence disclosed that the only deviation in Goldstein's process from the method described in the patent was that Goldstein ignited the pile of wire prior to superimposing the furnace, whereas the patent stipulates the reverse order of these steps. Trio asserts that it is immaterial whether the pile is ignited before or after superimposition of the furnace, and that the conclusion of the district court is therefore correct under the doctrine of equivalents.

The Supreme Court explained the doctrine of equivalents and the conditions for its invocation in Graver Tank & Mfg. Co. v. Linde Air Products Co.:

"The essence of the doctrine is that one may not practice a fraud on a patent. * * * 'To temper unsparing logic and prevent an infringer from stealing the benefit of the invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.'" 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

Here, by reversing the order of the steps of the process, there is produced "substantially the same function" (ignition of the insulation in the pile of scrap wire in preparation for burning) "in substantially the same way" (burning the insulation at low temperature) "to obtain the same results" (Number 1 grade scrap copper wire). Unless Trio is barred from asserting the doctrine of

---

23. *See also* Bennett v. Halahan, Aronson & Lyon, 285 F.2d 807, 48 CCPA 782 (1961).

24. The temperature of the burning pile of scrap wire is limited by the melting point of the metal, which would be known to a person skilled in the art. The patent also states that the gases emitted from the afterburner "are virtually colorless," and a person skilled in the art would be able to determine the proper temperature for afterburning easily by observing the presence or absence of smoke. Although the length of the afterburner is not specified, the patent drawings indicate that it is to be approximately equal to the height of the cone. In any event, such is not a critical part of the invention.

equivalents because of "file-wrapper estoppel,"[25] the conclusion that the patent was infringed must be affirmed.

▮ The doctrine of file-wrapper estoppel provides that where a patentee abandons or redrafts a claim more narrowly to avoid rejection on the basis of prior art, then the substance of the claim as originally drafted that was thereby excluded cannot be recaptured by resort to the doctrine of equivalents. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942). Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Schmidinger v. Welsh, 383 F.2d 455 (3d Cir. 1967), cert. denied, 390 U. S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968); Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3d Cir. 1962).

▮ The doctrine is based on the theory that the prior art is either in the public domain or already patented, so that the patentee may not claim it as part of his invention. By redrafting or abandoning a claim in the face of a prior art rejection, the patentee is conceding that he has not invented what he thereby disclaims, and therefore will not be heard to assert, at a later date, what he disclaimed as his invention. Accordingly, for "file-wrapper estoppel" to become operable, it is necessary, at the least, that a claim have been narrowed to avoid the prior art. Bishman Mfg. Co. v. Stewart-Warner Corp., 380 F.2d 336 (7th Cir.), cert. denied, 389 U.S. 897, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967).

▮ Here, the claims were redrafted, not because they trespassed upon the prior art, but because they were considered misdescriptive in view of the speci- fication of the patent. The rejection here was a technical matter based on the Rules of Practice of the Patent Office, and had nothing to do with the question whether the matter rejected was patentable. In such a situation, it would not be equitable to deprive a patentee of the full fruits of his invention because of a formalistic rule of the patent office. *See* Peterson Filters & Engineering Co. v. Eimco Corp., 155 U.S.P.Q. 89 (D. Utah, 1967), aff'd 406 F.2d 431, 438 (10th Cir. 1968).

For these reasons, we hold that, on the basis of the record developed below, the district court's conclusion of law that the patent had been infringed was not incorrect.

▮ Goldstein next asserts that even if it were held to be an infringer, such infringement was not willful because it sought the advice of patent counsel as to the patentability of Spitz's invention. However, the opinion of counsel was not sought after the patent issued, even though more than a year elapsed after issuance before Goldstein began to infringe. This alone is enough to support a conclusion of willfulness, Maxon Premix Burner Co. v. Mid-Continent Metal Prods. Co., 279 F.Supp. 164 (N.D.Ill. 1967), and when viewed in conjunction with the totality of Goldstein's actions, including sending blueprints and operating instructions to a foreign company, we cannot say that the trial court's conclusion in this regard was erroneous.

## CONCLUSION

The judgment of the district court with regard to the validity of the patent will be reversed, the judgment with regard to willful infringement will be affirmed, and the cause will be remanded

---

25. The file wrapper is "[t]he Patent Office file consisting of the original application, Office Actions, amendments and other written matter pertaining to the filing and prosecution of the application, and the issuance of the patent thereon. The documents are those actually exchanged between the applicant and the Patent Office. The file wrapper provides the written history of the application in the Patent Office. * * *" A. Smith. *supra*, at 2.

for further proceedings consistent with this opinion. Costs taxed in favor of Plaintiff, Trio Process Corporation in both appeals.

## A P P E N D I X

FIG. 1        FIG. 2

FIG. 3        FIG. 4

*INVENTOR.*
ALBERT W. SPITZ

BY *Harry Langsam*
ATTORNEY

[A5778]