531 F.2d 1243
 187 U.S.P.Q. 733
 CHRISTOPHER J. FOSTER, INC., Appellant,
v.
NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, and Whitman,
Requardt& Associates, Appellees.
CHRISTOPHER J. FOSTER, INC., Appellee,
v.
NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, and Whitman,
Requardt& Associates, Appellants.
 Nos. 75--1076, 75--1077.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 11, 1975.
Decided Oct. 22, 1975.
 
 Alan E. J. Branigan, Arlington, Va. (Griffin, Branigan & Butler, Arlington, Va., on brief), for Christopher J. Foster, Inc.
 Allen Kirkpatrick, Washington, D.C. (Cushman, Darby & Cushman, Kevin E. Joyce, Washington, D.C., Donald N. Rothman, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., Elliott I. Pollock, and Pollock, Philpitt & Vande-Sande, Washington, D.C., on brief), for Newport News Shipbuilding and Dry Dock Co. and Whitman, Requardt & Associates.
 Before WINTER, CRAVEN and BUTZNER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 This appeal involves the validity of claims 1, 4, 5, 7, and 11 of United States Patent 3,124,935 for graving docks, issued to Christopher J. Foster on March 17, 1964, and the charge that Newport News Shipbuilding and Dry Dock Co. and Whitman, Requardt & Associates, engineers engaged by Newport News to construct a dry dock, infringed the patent. We affirm the district court's judgment that the patent was anticipated by prior art and that even if it were valid, the doctrine of file wrapper estoppel defeats the claim of infringement.
 
 
 2
 The contested patent refers to an improvement in a graving dock, which is a basin excavated in the shore of a body of water. Since ships float into the dock, the floor must be below the water table. Consequently, when the gates are closed and water is expelled, hydrostatic pressure is exerted on the underside of the dock by seepage beneath the floor. This problem is especially serious in water-bearing soil where seepage is heavy. If the pressure is not accommodated in some manner, either the floor will rupture or the entire structure will shift. Rupture is the usual result.
 
 
 3
 Various types of docks have been constructed to counter hydrostatic pressure. The simplest is the gravity dock, which uses the sheer weight of a concrete floor, often forty feet thick, to withstand the pressure. In a partially relieved dock, seepage water escapes upwards through floor drains to lessen the pressure. A third kind of graving dock, the one involved here, is the fully relieved dock, in which water underneath the floor is drained by a network of pipes below the floor to a sump from which it is pumped. Since it reduces pressure more effectively than the others, a fully relieved dock requires the thinnest floor of the three.
 
 
 4
 Essentially, the Foster patent involves a system of drain pipes in a gravel bed beneath the concrete dock floor. Set on a grade, the pipes empty into a sump from which a pump removes accumulated water. Vents allow atmospheric pressure to reach the underside of the dock floor so the water will flow to the sump by gravity.[1] The district court held that the invention disclosed by the claims in issue had been fully anticipated by the St. John dry dock, built in New Brunswick more than 50 years ago, and that it was therefore invalid under 35 U.S.C. §§ 102(a) and (b).
 
 
 5
 The St. John dry dock was built on rock, not water-bearing soil. Nevertheless, its designers made allowance for water seepage. An article in The Engineering Journal describes it as having a subfloor drainage system to relieve hydrostatic pressure.[2] Although the article does not mention venting, the St. John dock had open vertical drains extending through the floor. The district court, accepting the testimony of expert witnesses, found that these openings vent the underside of the floor to the atmosphere. This finding is amply supported by the evidence and is binding on us. Though relevant, the St. John dock was not considered by the patent examiner, and therefore the statutory presumption of the Foster patent's validity is at least weakened. See Heyl & Patterson, Inc. v. McDowell Co., 317 F.2d 719, 722 (4th Cir. 1963).
 
 
 6
 Foster contends that the St. John dock is distinguishable since it was built in a rock formation, while his invention was designed for water-bearing soil. Although Foster emphasized before the Patent Examiner that his dock was intended for use in water-bearing soil, the distinction that he now claims was not embodied in the patent. Claim 1 describes a dock 'situated on bearing soil or the like.' To deal with a broad range of seepage rates, he claimed conduits to drain underfloor water 'at a rate which is at least equal to that at which such water naturally accumulates under said floor . . ..'[3] Rather than being limited to docks constructed in water-bearing soil, Foster's patent encompassed those such as St. John's that are built on other foundations, regardless of permeability.
 
 
 7
 Even if Foster's patent were limited to water-bearing soil, we agree with the district court that it would not significantly differ from the St. John dock. The engineers of the St. John dock expected water seepage through rock fissures and installed drains under the floor and pumps to relieve hydrostatic pressure. The rate of seepage, not its absence, is the principal difference between the St. John dock and Foster's. The eventual buildup of pressure would have the same results in both docks if water were not removed from beneath the floor. The decision as to which type of dock to build is largely economic. It is influenced by the comparative costs of pouring a thick floor for a gravity dock or pumping water continuously during the life of a fully relieved dock.
 
 
 8
 Accepting Foster's contention would mean that a person constructing a dock identical to Foster's on a rock base would be able to defend against an infringement suit on the ground that the patent was anticipated by the St. John dock. In contrast, a person constructing a similar dock in water-bearing soil would be liable for infringing the Foster patent. But the law does not compel acceptance of this anomaly. The subsurface, whether rock or soil, is not an element of Foster's patented dock. It is the substance on which the dock is situated. An invention disclosed by prior art does not become patentable simply because it is used in its customary way on a different object, 'even if the new result had not before been contemplated.' Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U.S. 11, 18, 12 S.Ct. 601, 604, 36 L.Ed. 327 (1892). Grinnell Corp. v. Virginia Electric & Power Co., 401 F.2d 451 (4th Cir. 1968); Fluor Corp. v. Gulf Interstate Gas Co., 259 F.2d 405, 408 (5th Cir. 1958). Cf. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945). We conclude, therefore, that the district court properly ruled that the claims in suit are invalid.
 
 
 9
 The district court also held that even if the Foster patent were valid, the Newport News dock would not infringe it. Foster was denied a patent for his dock six times between 1956 and 1962. He was granted the patent in 1964 only after he amended his application to include venting to the atmosphere through the dock floor. Although Foster's earlier applications included the use of atmospheric pressure, only the addition of the floor perforations distinguished it from the Endicott dock, Patent No. 470,750, March 15, 1892, which also provided for subfloor drainage.
 
 
 10
 Foster now claims that the floor perforations are not essential to his patent. But '(a) patentee, having deliberately taken a position in the Patent Office proceedings to induce the grant of the patent to him, is not thereafter permitted to repudiate that position.' Berry Brothers Corp. v. Sigmon, 317 F.2d 700, 706 (4th Cir. 1963). Since Foster relied on the floor vents to obtain his patent, he is now estopped from denying their importance.
 
 
 11
 The Newport News dock does not utilize floor vents to allow the air to reach the underside of the floor. Instead, atmospheric pressure is exerted through loose sand and gravel surrounding the dock walls to induce the subfloor water to flow by gravity to the sumps. Foster contends that this is equivalent to venting through his floor openings. His argument, however, overlooks an exception to the application of the doctrine of equivalents. A patentee cannot rely on the doctrine to recapture the broad claims that he has surrendered by amendments adopted to induce the grant of a patent. See Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736 (1942). Therefore, the district court correctly found no infringement by the Newport News dock.
 
 
 12
 Our disposition of Foster's appeal makes it unnecessary for us to consider the issues raised by Newport News in its cross appeal other than to say we find no error in the district court's refusal to award counsel fees.
 
 
 13
 AFFIRMED.
 
 
 
 [1]
 Claim 1 describes Foster's invention as follows:
 'In a graving dock having a generally continuous, bottom-enclosing floor situated on bearing soil or the like at a depth which is below the natural water level in such soil, the improvement comprising means for reducing excess natural hydrostatic pressure as would otherwise be directed upwardly against the underside of said floor, said means comprising drainage means for removing accumulating water from below said floor including pump means, a seepage bed of material disposed underneath substantially the entire area of said floor, conduit means including portions substantially adjacent the underside of said floor and communicating with said seepage bed to admit entry of said accumulating water from the latter, at least said conduit portions being disposed in direction which is generally parallel to the general plane of said floor and said conduit means being adapted to conduct said accumulating water to said pump means at a rate which is at least equal to that at which such water naturally accumulates under said floor, and means defining open vent passages between said seepage bed and the atmosphere, said drainage means being disposed to remove said accumulating water at a flow level whereby such natural hydrostatic pressure excess is maintained at negligible value at the level of the underside of said floor.' (E. 48)
 Dependent claims 4, 5, and 7 describe variations in the location, type, and configuration of the drainage system. Independent claim 11 defines a method for reducing hydrostatic pressure against the floor by drains 'while maintaining vent communication between the underside of said floor and the atmosphere.'
 
 
 [2]
 'A minimum floor thickness of three feet was established, but owing to the fact that the rock was practically standing on edge and on account of the pocketing effect of blasting vertical drill holes in rock so situated, it was decided to keep all the floor from direct contact with the underlying solid rock, by pouring this floor concrete on a layer of loose rock; this open layer of loose rock to be fully drained with longitudinal and cross tile drains, laid before pouring the floor concrete and covered first with a mount of loose stone and then a thin protective coat of concrete. By adopting this method of construction, it was felt that complete and adequate under-drainage would result, while if an effort were made to clean the foundation, all to the solid rock, numerous pockets originating from drill holes would be left where no direct bond with the solid rock would be obtained, but completely surrounding such pockets and entirely sealing them, there would be the bond between solid rock and floor slab concrete, and as these pockets would not in any way connect with the under-drain system, a condition of accumulating hydrostatic pressure would be created under these parts of the floor slab, with its resultant ultimate rupture or displacement.' (E. 31--32)
 VI The Engineering Journal 423, 428--29 (Montreal, Canada, 1923).
 
 
 [3]
 See note 1 supra