CLOPAY CORPORATION, Plaintiff,

v.

BLESSINGS CORPORATION, and Blessings Products, Inc., Defendants.

Civ. A. No. 4363.

United States District Court,
D. Delaware.

Oct. 21, 1976.

William J. Wier, Murdock & Walsh, Wilmington, Del., for plaintiff; David J. Josephic, William G. Konold, Wood, Herron & Evans, Cincinnati, Ohio, of counsel.

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., for defendants; John M. Calimafde, Charles W. Neill, Robert A. Schroeder, Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, of counsel.

## OPINION

STAPLETON, District Judge.

In this action plaintiff, Clopay Corporation has charged defendants Blessings Corporation and Blessings Products, Incorporated, with infringement of Trounstine, et al., Patent No. 3,484,835, a patent for embossed plastic film. Plaintiff, the owner of the patent-in-suit, seeks a judgment that plaintiff's patent is valid and has been infringed, and asks that defendants be enjoined from further infringement, that an accounting be held to determine damages, and that plaintiff be awarded treble damages, attorneys' fees, interest, and costs. Defendants claim that the patent-in-suit is invalid and deny infringement. They further assert that plaintiff was guilty of fraud in the procurement of the patent and of bringing and maintaining this suit recklessly and for reasons of harassment.

Defendants are Delaware corporations. There is no dispute as to the Court's jurisdiction of this action under 28 U.S.C. § 1338(a), and venue is properly laid in this District under 28 U.S.C. §§ 1391(c) and 1400(b).

Both plaintiff and defendants manufacture embossed plastic film products. At issue in this suit is a thin film which has an

embossed design simulating a taffeta woven cloth and which is used by the disposable products industry as a water-repellant backing for such items as hospital incontinent pads and baby's diapers. The particular film in issue has the claimed advantage that its free lengthwise edges resist curling when the film is fed through high speed machinery for the purpose of securing the film backing to the absorbent portion of the pad or diaper.

The plastic film industry manufactures films of varying thicknesses and designs to meet varying needs. The thin films plaintiff has manufactured include those which simulate woven cloth such as linen, box linen, shantung, boucle, and taffeta. The non-shiny appearance of these and other fabric-like designs is achieved by embossing the plastic film with a design having a certain minimum height above the surface of the film depending on that film's thickness. In polyethylene film of one mil thickness,[1] for example, to avoid a shiny effect the design must have a height above the surface of at least 3 mils.

Simulation of the appearance of a particular woven fabric is accomplished by varying the planar dimensions, that is the dimensions of the design on the surface of the film. The taffeta-like appearance, for example, is produced by embossing the film with a series of raised bosses, separated by a network of continuous channels which intersect each other in a grid-like pattern. In addition, the channels must be spaced

relatively close to each other to achieve the soft, taffeta-like effect.

Prior to the invention in question, plaintiff had manufactured a thin film with a taffeta-like appearance which was used as a water repellant backing for such items as diapers and incontinent pads. The planar dimensions of the film, that is the measurements of the spaces separating the channel-like areas, were the same as those of the film manufactured by plaintiff following the invention. The early films also had the same depth measurements as the post-invention film, that is, the films were about one mil in thickness and had boss heights of about 3–4 mils. The network of channels in this old taffeta-like film, however, ran diagonally to the free edges of the film, forming a diamond-like pattern of intersecting channels, enclosing raised bosses of the same shape.

The film claimed in the patent-in-suit and referred to by plaintiff as TAFF–A–FLEX differs from this old taffeta-like film in that the network of channels and bosses is reoriented so that they run perpendicular to the free edges of the film, rather than diagonal to the free edges as in the old so-called diagonal taffeta. The claimed advantage of this reorientation is that the new film, when fed through high speed machinery during the diaper or pad manufacturing process, does not funnel or curl at the edges, thus facilitating the glueing of the plastic film to the diaper or pad surface.[2]

---

1. One mil equals one one-thousandth (.001) of an inch.

2. The sole claim of the patent-in-suit reads as follows:

An embossed length of thermoplastic film of about 1 mil in thickness, said thermoplastic is selected from the group consisting of polyethylene, polypropylene and copolymers thereof, whose free lengthwise edges substantially parallel one another and have edge-curl resistance under machine stress in their lengthwise direction, the embossed design simulating taffeta woven cloth without a shiny surface surface (sic) effect comprising,

a series of raised bosses separated by substantially perpendicularly intersecting longitudinal and lateral channel-like areas on the

top side of said film, said channel-like areas being spaced apart about 0.010 inch to form a network of generally rectangular-shaped channels separating said raised bosses, said raised bosses protrude above said channel-like areas to a height in the range of about 0.003 to about 0.004 inch, said network providing a soft fabric-like tone without a shiny surface effect, and on the opposite side thereof,

a series of depressed areas enclosed by substantially perpendicularly intersecting longitudinal and lateral ridges, said bosses overlie said depressed areas, said channel-like areas overlie said ridges, both said lateral channel-like areas and said lateral ridges extending substantially perpendicular to said free edges.

## I INVALIDITY

### A *Background*

In about 1960 or 1961 Clopay entered the disposable products market by supplying Diana Manufacturing Company with a taffeta embossed plastic film for use in the manufacture of incontinent pads. The incontinent pad industry had originally used paper backing which crackled and made noise under the patient and thereafter went to plain polyethylene films. It ultimately moved to taffeta embossed film because it helped prevent the pad from sliding under the patient and because it was aesthetically more appealing to view and to handle.

From the outset Diana encountered a problem with edge curl during the pad manufacturing process.[3] Pads were made by joining the taffeta film backing to the pad wading and to a thick, heavy tissue which overlay the wading. The three plys were fed from supply rolls to a point where they were to be joined. The film backing extended out from the other plys creating a margin on which glue was to be placed. As the three plys were joined the glued margin was to be folded over and pressed firmly against the other layers securing the three plys together.

Edge curl occurred as the film backing was fed through the high speed machinery and subjected to stress along its lengthwise direction. As that stress was applied, the margin of the film to which the glue was to be applied curled, thereby preventing the film from coming into contact with the glue rollers. As a result no glue reached the film margin and the three plys of the pad could not be secured. The glue which did not reach the film margin instead built up on the belts of the machinery. Production often stopped while the machine belts were cleaned off and numerous pads were thrown out because they were not adequately glued.

The edge curl problem grew increasingly more serious as the pad manufacturing industry, for competitive reasons, demanded thinner films. While the 2 mil films which Clopay supplied at the outset edge curled, by about 1962, when Clopay began supplying 1 mil film, the problem became critical. Pad manufacturers needed even thinner films and Clopay, unable to supply thin films which did not edge curl, seriously considered closing down its taffeta film business.

From 1960 until 1966 when the co-patentees discovered the source of the edge curl problem, numerous unsuccessful efforts were made by Clopay, its customers, and other film manufacturers to solve the problem. In each instance, the approach taken was to attempt to reduce the tension applied to the film in the pad manufacturing process or to strengthen the film so as to increase its resistance to tension. Clopay, for example, experimented with the film manufacturing process itself, stiffening the film, changing the film's cooling rate during production and changing the speed of the production equipment. It also tried winding the film differently and decreasing the depth of the boss. Finally, Clopay encouraged its customers to alter the pad manufacturing process and even redesigned their customer's equipment, moving the film rollers closer to the glue rolls and otherwise attempting to reduce the film tension.[4]

None of these efforts proved fruitful. Then, sometime in 1966 Thomas McCauley, Plant Manager of the Augusta Division of Clopay, mentioned to Henry Trounstine, Manager of the Plastic Film Division of Clopay, his belief that the edge curl was related in some way to the diagonal orientation of the film's channels. He noticed that when he pulled on the taffeta film in a lengthwise direction, the diagonal channels imparted forces to the edge of the film

---

3. Henry Trounstine, one of the co-patentees, testified that Clopay had known about the edge curl tendencies of diagonal taffeta even before supplying such film to Diana.

4. Other attempts included cocking of the supply rolls, shifting of the supply rolls, changing rolls from one machine to another, changing operators, putting drivers on idler rolls to help the driving of the belts, and employing flat bars and roll bars underneath the film.

which caused it to curl. Nothing was done in response to McCauley's idea, however, until about a month later when Trounstine accompanied McCauley to Diana in an attempt to solve the edge curl problem. While at Diana, McCauley again mentioned his belief that the problem was caused by the diagonal orientation. Acting upon McCauley's suggestion Trounstine took a piece of diagonal taffeta film and cut it so that the new free edge of the film was perpendicular to the channels, pulled along the lengthwise direction of that free edge and noted that the edge curl problem seemed to be alleviated. Neither Trounstine, McCauley nor John Ross, Clopay's contact at Diana who was also present at the demonstration, were sure at that point, however, that McCauley had actually hit upon the solution in a production context.

McCauley and Trounstine returned to Clopay where they consulted with Arthur Raffel, Clopay's Chief Engineer, about designing and ordering an engraving roll that would permit them to manufacture taffeta film with channels perpendicular to the free edge of the film. The taffeta film produced from that roll did not edge curl during the pad manufacturing process. During the year immediately following the intro-

duction of the square taffeta Clopay's sales of taffeta film tripled and Clopay was able to reduce the film thickness in response to industry demand to ¾ mils.

## B The Legal Framework

■■ Defendants argue that the patent-in-suit is invalid and unenforceable for obviousness over the prior art.[5] Under 35 U.S.C. § 103, an invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains". Once the Patent Office applies this standard and issues a patent, it is presumed to be valid and anyone challenging its validity must establish his case by clear and convincing proof. *Trio Process Corporation v. L. Goldstein's Sons, Inc.,* 461 F.2d 66 (3rd Cir. 1972).

■■ In the landmark case of *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court outlined the general approach to be followed by a court in determining whether an invention is obvious:

---

5. Defendants raised in their pleadings the contention that the patent is anticipated by the prior art and, therefore, invalid for lack of novelty pursuant to 35 U.S.C. § 102. They have not pressed this contention in the briefing and argument, however, apparently conceding that the patent-in-suit is not invalid for lack of novelty under the existing law of this Circuit.

While it is clear that the capability for making a square taffeta film existed in the prior art for some time (see deposition of engraver Martin Singer, who testified that the engraving industry had the capacity to make rolls to manufacture such films as early as 1959), the fact remains that a square taffeta film had neither been produced nor suggested in the prior art.

The law is clear that one cannot obtain a patent on an old device simply by discovering a new use for that same device. *Ansonia Brass & Cooper Co. v. Electrical Supply Co.,* 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327 (1892); *General Electric Co. v. Jewel Co.,* 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945); *Gould-National Batteries, Inc. v. Gulton Industries, Inc.,* 361 F.2d 912 (3rd Cir. 1966); *Rosenberg, Patent Law Fundamentals,* p. 91. But the law is equally clear in

this Circuit that the defense of anticipation requires that all elements of the claimed invention, except for insignificant differences, must be disclosed in a single prior art reference. *Congoleum Industries, Inc. v. Armstrong Cork Company,* 339 F.Supp. 1036 (E.D.Pa.1972), *aff'd,* 510 F.2d 334 (3rd Cir. 1975), *cert. denied* 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975); *cf. W. L. Gore & Associates v. Carlisle Corporation,* 529 F.2d 614 (3rd Cir. 1976). This principle applies as well to combination patents. "To anticipate a combination, the combination in its entirety must be old." *Bristol v. Otis Elevator Company,* 52 F.2d 772 at 773 (3rd Cir. 1931); see also *Worthington v. Southern New Jersey Newspapers, Inc.,* 323 F.Supp. 443 (D.N.J.1970). Here, the elements of the invention derive from two prior art references, the diagonal taffeta film and the Smith, et al. patent or other films with square-to-the edge orientation. (See pp. 10–14, *infra* ). The patent-in-suit claims significant differences over each prior art reference and consequently under the rules applicable to the defense of anticipation, I must conclude that the Trounstine, et al. patent is not invalid under 35 U.S.C. § 102.

. . . Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. . .

383 U.S. 1 at 17–18, 86 S.Ct. 684 at 694.

Evaluating the criteria stated above, I conclude that the subject matter patented would not have been obvious to one skilled in the art.

### C Scope And Content Of The Prior Art

#### 1 The patents cited by the Patent Office Examiners.

In rejecting the claims of the original application for the patent-in-suit,[6] the Patent Office Examiners cited five patents (hereinafter referred to as Rosen, Chavannes, Knowland, Corbett and Smith). Both Rosen and Chavannes disclose methods for embossing thermoplastic film. Rosen further teaches that an embossed surface may be obtained on such thermoplastic materials as polyethylene, polypropylene and other polyolefins and copolymers thereof.

The Knowland patent teaches a process of imparting an "ornamental and decorative finish" to the surface of sheets of thermoplastic materials, which materials include polyethylene. As the Patent Office Examiners noted, figure 3 of the Knowland patent discloses a sheet of material whose top surface simulates a textured fabric.

Although Knowland makes no reference to the thickness of the material to be embossed, Corbett discloses a method for im-

proving the windability of films of less than 1 to less than 2 mils in thickness by temporarily embossing them. The embossed pattern disclosed in Corbett comprises "a series of raised bosses separated by intersecting channel-like areas on one side of said sheet, and on the opposite side thereof, a series of intersecting ridges separating depressed areas enclosed thereby".

Smith discloses a method for producing a three-dimensional textured plastic film of any desired thickness whose pattern is formed by applying a vacuum to the undersurface of a length of smooth film as it is advanced over a patterned surface, heated and then cooled. Smith further teaches that the resultant film may have a textile-like surface as well as any other three-dimensional pattern. Figure 5 of the patent illustrates a finished sheet of material which has perpendicularly intersecting lines which form the borders for essentially square areas which project above the surface of the film. The perpendicularly intersecting lines themselves appear to intersect the free edges of the film at right angles.

At trial plaintiff introduced a sample of thin plastic film processed according to the method disclosed in Smith. Although the film contained numerous imperfections, certain portions of the underside had a fabric-like appearance, but with a grosser design and coarser texture than that of the patented film. Moreover, the top side had a wire mesh pattern which did not at all resemble taffeta.

#### 2 Prior films.

At the time of the invention-in-suit and prior thereto, plaintiff offered a line of embossed plastic films which simulated woven plastic. One such design was the film which had the same dimensions as the post-invention film, but whose channels intersected the free edges of the film on a diagonal. Of the embossed films offered, only the diagonal taffeta exhibited the edge curl phenomenon.

---

**6.** See *infra* at p. 1324.

Clopay also manufactured at this time an embossed film which resembled linen and which was sold primarily to the disposable drapery industry. The linen design consists of a series of relatively small raised bosses arranged in rows and columns to form a square and bordered by a series of large rectangular-shaped ridges and bosses. Channels which intersect each other at right angles run between the small squares, but are interrupted at regular intervals by the border of rectangular ridges and bosses. At the points where the channels separating the small squares meet the free edges of the film, however, they intersect it at right angles. The dimensions of the linen design are grosser than that of the taffeta design, and the film has a much rougher surface appearance than the taffeta film. The linen-embossed film, like the other non-taffeta embossed films, did not edge curl. Indeed, when Diana was experiencing severe edge curl problems with Clopay's taffeta film, Clopay offered linen film as a non-curling substitute. Diana refused to use the linen film, however, because it had a "gross paperlike" texture not suited to the needs of its customers.

Defendants also introduced in evidence the deposition of William Prendergast, President of the Chavannes International Corporation, developers of embossing equipment for plastic films. At his deposition, Prendergast identified a sheet of film with a patchwork sampling of different embossed designs which had been produced in 1955 or 1956 by Chavannes, which at that time was doing business as Chavannes Industrial Synthetics. The embossed designs were produced through a process invented at Chavannes and referred to as continuous vacuum embossing. Several examples of the embossed films contained in the exhibit identified by Prendergast simulate woven fabric, although the patterns are not nearly as fine nor as sharply defined as are the patterns in the patented film. Two of the sample patterns in particular, those Mr. Prendergast referred to as muslin and linen, contain channels with rather irregular borders which are substantially perpendicular to each other and to the free edges of the film.[7]

## D. Differences Between The Prior Art And The Claims At Issue

The prior art disclosed embossed film made from the same materials as the patented film and with thicknesses of less than 1 mil to less than 2 mils. It also disclosed embossed plastic film with dimensions that created a taffeta-like appearance, but which edge curled. Finally, it disclosed embossed film with a fabric-like appearance that had channels substantially perpendicular to themselves and to the free edges of the film. What the prior art did not disclose was thin taffeta-like film which had channels perpendicular to the free edges of the film and which did not edge curl. Nor did the prior art disclose an explanation for why the edge curl problem existed in diagonal taffeta film.

## E Level Of Ordinary Skill In The Art

I conclude that the level of ordinary skill in the art was a relatively humble one in the area of the relationship between the pattern of an embossed plastic film and its behavioral characteristics. The record indicates that, at the time of the invention, there was no one who specialized or was technically trained in film design. Ideas for film designs originated with customers and production people like Becker, McCau-

---

7. Defendants also claim that at the time of the invention-in-suit the entire plastic film industry was manufacturing a square film which differed from the patented film only in size, the patented film having finer dimensions. In support of this contention they rely on deposition testimony given by Mr. McCauley. Based on a reading of the McCauley deposition and his trial testimony, however, I am satisfied that he was referring in his deposition to films with channels diagonal to the free edges. I, therefore, reject defendants' contention that prior to this invention the film industry was manufacturing a square film similar in all respects to the patented film except for the dimensions.

ley, Trounstine and Comarata,[8] who were employed by film producers.[9] Engineers, like Raffel, translated requests from these sources into specifications which could be executed by those in the engraving trade, whose sole contribution was the manufacture of engraving rolls conforming to the stated specifications.[10]

The production people in the embossed film industry who determined the design of the plastic films, through practical experience, had become highly adept in developing designs which would have a particular appearance and feel. Moreover, they were quite skilled in relating film composition and thickness to manufacturing demands. Neither the prior art patents nor any other evidence in the record suggests, however, that skilled artisans in the industry had made any substantial progress toward appreciating the relationship between the patterns of the films produced and their behavioral characteristics during the course of the manufacture of consumer products.[11]

Prior to the introduction of Clopay's square taffeta, when film producers requested engraving rolls for taffeta film, they did not specify any particular orientation of the channels with respect to the free edge. All rolls previously produced, however, had designs whose channels ran diagonally to the free edges of the film. The explanation is found in practices adopted in the manufacture of engraving rolls for the printing industry, and was unrelated to the needs or practices of the film embossing

industry.[12] I find this fact significant because it indicates that the reference point for those experienced in the art of film embossing was that taffeta film had a design diagonal to the free edges of the film.

### F Secondary Considerations

As earlier noted, edge curling in diagonal taffeta created serious machining problems in the manufacture of underpads and diapers. The undisputed testimony from plaintiff's employees and from Ross of Diana Manufacturing, was that the edge curl problem existed from the inception of diagonal taffeta's use as backing for underpads in the early 60's until 1967 when the new square taffeta was introduced. Edge curling caused substantial amounts of diagonal taffeta to be wasted in the pad manufacturing process and caused production slowdowns as excess glue buildup on the machinery forced operators to close down the machines from 5 to 10 minutes at a time while they cleaned off the glue.

Customers rejected large quantities of diagonal taffeta, at times returning the materials to Clopay by the truckload. The problems grew so serious that Clopay considered closing down its taffeta film business entirely.

Trounstine, McCauley and Comarata, Clopay's customer contacts person and troubleshooter, all visited Clopay's customers to observe and hopefully find a solution to the edge curl problem. Comarata testified that

8. Ivan Becker, defendants' president and corporate vice president; Henry Comarata, Clopay's customer liaison and trouble-shooter.

9. There is no evidence of independent research or technical groups working in the area of film design.

10. In some instances, engravers were supplied simply with existing film samples and were asked to make engraving rolls which would produce identical films. In these instances the engravers would take a plastic mold of the film, from which a hardened plastic plate and then the final embossing roll were then formed. John Michael, the engraver who testified at trial, indicated that he had no expertise regard-

ing film production or how film behaved when being machined.

11. While Mr. Becker testified that he solved a film tearing problem by changing the pattern of a film, I understand him to be referring to a period after the formation of Edison Plastics in August of 1967.

12. John Michael, technical director for Armatek Industries, testified that applying a 45 degree angle to such engraving rolls prevented excessive wear and promoted longer equipment life. He also testified that this diagonal orientation had no such similar effects on the life of equipment used in the embossment of plastic films.

over 75% of his time on the road between 1963 and 1967 was spent addressing himself to problems associated with the diagonal taffeta, and that over half of these problems concerned edge curling.

Despite their numerous efforts, Clopay and its customers failed to solve the edge curl problem. Nor were efforts of Clopay's chief competitor at the time, the Gering Plastic Division of Monsanto, any more productive. Monsanto experienced the same edge curl problems with its diagonal taffeta and was equally unsuccessful in finding a solution to the problem.

When Clopay's new square taffeta, TAFF–A–FLEX, was introduced it met with immediate and widespread commercial success which can only be attributed to its edge curl resistance. As noted above, Clopay's sales of taffeta embossed film tripled during the year following the introduction of square taffeta and Clopay was able to meet industry demand for taffeta embossed film of less than 1 mil in thickness.

John Ross of Diana Manufacturing testified that the square taffeta produced by Clopay solved most of the edge curl problem Diana had been experiencing, eliminated the waste formerly associated with taffeta film and permitted the running of a lighter weight film of less than 1 mil in thickness. Diana saw such value in the improved taffeta design that it attempted to obtain an exclusive licensing agreement with Clopay for TAFF–A–FLEX.

Further evidence of square taffeta's commercial usefulness and commercial success is found in the fact that Clopay's customers used the designation square taffeta or TAFF–A–FLEX when ordering taffeta films from Clopay's competitors. For example, Parke Davis and Johnson & Johnson, two other disposable products manufacturers, ordered taffeta film from defendants under the description, square taffeta or TAFF–A–FLEX. Indeed, when Diana ordered taffeta film from defendants, it particularly specified that it desired square taffeta or TAFF–A–FLEX, not the old diagonal design.

## G Analysis

The patent-in-suit here represents a combination of elements in the prior art. More specifically, it combines the embossing dimensions which produce the soft, dull taffeta-like appearance of plaintiff's diagonal taffeta film with the orientation of the embossed design found in Clopay's linen film, in the vacuum embossed film produced by Chavannes, and in the film disclosed in the Smith patent.

The fact that a patent claims a combination of old elements does not necessarily lead to a conclusion that the claimed invention is obvious. *Sakraida v. Agpro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). Combinations of known elements may add to the fund of knowledge in the art, and, therefore, be patentable, if the combination produces a result which those skilled in the field, based on the prior art knowledge of the functions of the individual elements, would not have expected. *Sakraida v. Agpro, Inc., supra; Anderson's-Black Rock v. Pavement Company*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *A & P Tea Company v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). As the Supreme Court noted in *A & P Tea Company, supra* at pp. 152–153, 71 S.Ct. at p. 130, however:

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans.

It is a well established principle that one may add to the sum of useful knowledge by uncovering the nonobvious source of a problem and in devising a solution which, though involving a combination of old elements obvious after the source of the problem is isolated, has never before occurred to those skilled in the art. *Eibel Process Corp. v. Minnesota & Ontario Paper*

Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); *Trio Process Corporation v. L. Goldstein's Sons, Inc.,* 361 F.2d 66 (3rd Cir. 1972); *Application of Aufhauser,* 399 F.2d 275 (CCPA 1968); *Rosenberg, Patent Law Fundamentals,* 117 (1975); *Anchor Plastics Co., Inc. v. Dynex Industrial Plastics Corporation,* 363 F.Supp. 582 (D.N.J.1973), *aff'd.* 492 F.2d 1238 (3rd Cir. 1974), *cert. denied* 417 U.S. 955, 94 S.Ct. 3083, 41 L.Ed.2d 674 (1974). So here, the invention was the discovery that the edge curl problem resulted from the diagonal orientation of the film channels and that it could be substantially eliminated by utilizing channels perpendicular to the free edge in combination with the taffeta design.

While the difference between a diagonal taffeta plastic film and a square taffeta one may not, in and of itself, suggest that McCauley and Trounstine occasioned a substantial advance in their field, the patent law teaches that questions of obviousness must be determined in the context in which the claimed invention was made. At the time of the invention in this case, the industry had never produced a square taffeta design. While the possibility of producing a film of this design might have been acknowledged by one skilled in the art if he had been asked, nothing in this record suggests that there was any reason for such an artisan to suspect that such a design would solve the problem which was plaguing his industry. To the contrary, the record establishes that everyone who had theretofore addressed himself to the problem had believed that the solution lay in the direction of reducing the machine tension or increasing the strength of the film. This view of the problem had resulted in a long series of fruitless suggestions for changes in the film composition, the film production process, the film handling process and the pad machining process itself. But perhaps the most convincing evidence of the fact that the McCauley-Trounstine solution to the problem was not obvious to those working in the field is the fact that even after McCauley made his original suggestion that the problem might lie in the channel orientation, it took a second prompting one

month later before Trounstine, an individual himself skilled in the art, tried reorienting the design. And even then neither of these men was confident that they had hit upon the answer to the edge curl problem in a production context.

I cannot accept defendants' contention that the known edge curl resistance of linen film would have led one skilled in the art to suspect that the problem lay in the channel orientation. The argument is easy enough to make with the benefit of hindsight, but the record does not support the proposition that knowledge of the curl resistance of linen film would lead one working on the edge curl problem to channel orientation as the source of that problem. First of all we know as a fact that it did not during a period of six years. And this seems understandable. The orientation of the channels was neither the only, nor the most obvious, feature which distinguished the linen from the taffeta film. Its channels were interrupted by large bosses and ridges, its bosses more shallow in thin films, and the planar dimensions of its design were considerably grosser. Moreover, there were a number of other patterns of film being produced, some without channels, which also were curl resistant. In this context, isolation of the problem was not the simple task that defendants would suggest.

Nor am I free to accept defendants' contention that the invention was obvious because a seamstress or anyone else familiar with how cloth material behaves when pulled along its bias would know that the edge curl problem could be solved by reorienting the channels. There is no evidence whatever in this record which suggests that embossed plastic film behaves in the same manner as cloth material or that one skilled in this field would expect it to do so. Indeed, the only competent evidence on this point, the testimony of Mr. Trounstine, convinces me that one skilled in this art would not look to the experience of others with cloth in trying to predict the behavior of embossed plastic film.

Finally, I find the evidence with respect to the "secondary criteria" persuasive. The

embossing industry's inability to solve a serious long-standing problem and the immediate and overwhelming success of the solution once found is probative evidence that the solution was not obvious.

■ In summary, I conclude that the defendants have failed to demonstrate obviousness by clear and convincing proof. To the contrary, the evidence as a whole affirmatively shows that the invention was not obvious. The patent is, accordingly, valid.[13]

## II INFRINGEMENT

Defendants admit that they currently manufacture films virtually identical to those which plaintiff manufactures. They maintain, however, that neither their films nor plaintiff's films have the dimensions claimed in the patent-in-suit. Moreover, defendants argue that, in determining the infringement issue, the claim of the patent-in-suit must be construed narrowly pursuant to the doctrine of "file wrapper estoppel" to reflect the fact that in order to obtain the patent-in-suit plaintiff had to substitute broad claims as to the film dimensions for the more narrow claims contained in the patent as ultimately issued.

■ Under the file wrapper estoppel doctrine a patentee cannot read into the invention claims which were surrendered during the course of proceedings before the patent office in order to obtain the patent-in-suit. *Exhibit Supply Company v. Ace Corporation,* 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); *Jones v. O. A. Newton & Son Company,* 317 F.Supp. 705 (D.Del.1970); *Christopher J. Foster, Inc. v. Newport News Shipbuilding and Drydock Company, et al.,* 187 U.S.P.Q. 733 (1975). Thus, a patentee cannot, through the doctrine of equivalents, give to the claims of his patent a breadth they might ordinarily have but for the fact that that breadth was surrendered before the Patent Office. *Graham v. John Deere Company,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Trio Process Corporation v. L. Goldstein's & Sons, Inc.,* 461 F.2d 66 (3d Cir. 1972); *Exhibit Supply Company v. Ace Corporation, supra; Jones v. O. A. Newton & Son Company, supra; Christopher J. Foster, Inc. v. Newport News Shipbuilding & Drydock Company, et al., supra.*

Plaintiff asserts, however, that in order to invoke this doctrine it must be demonstrated that a claim has been narrowed in order to avoid the prior art. *Trio Process Corporation v. L. Goldstein's Son, Inc., supra.* That is, a patentee is not estopped from asserting a claim of equal breadth to one which had been deleted from the origi-

---

**13.** Defendants argue that the patent-in-suit is not entitled to a presumption of validity because such a presumption is vitiated where it is shown that the Patent Office Examiners did not consider the most pertinent prior art. While I agree in principle, I do not find that the Examiners failed to consider the most pertinent prior art.

Defendants contend that the patent applicants did not tell the Patent Office Examiners of two pieces of prior art which are said to be more pertinent than the cited references: (1) the diagonal taffeta film manufactured by Clopay, and (2) the embossed linen film. As to the diagonal taffeta film, the record is clear that the patentees informed the examiner about a diagonal taffeta film with dimensions identical to those of the patented film and differing from the patented film only in the orientation of its channels. (See file wrapper and affidavit of Martin Krier). Although the examiners were not told about the linen film, I conclude that the design's discontinuous channels, and the other differences mentioned in the text suffi-

ciently distinguish it from the patented film to make it no more pertinent than the film disclosed by the Smith patent of which the examiners were aware. I do not believe the applicants had a duty to bring the curl resistant quality of linen film specifically to the attention of the patent office any more than they had the duty to bring the curl resistant quality of a variety of other and totally different prior patterns to its attention. They did not represent to the examiners that all embossed plastic films edged curled and, indeed, the fair implication from the presentation of the problem solely in the context of designs like the old diagonal taffeta was that other existing films did not edge curl. As is suggested by this discussion, I have also concluded that defendants' fraud on the patent office argument is without merit. In addition to the fact that no material information was withheld, I conclude that the patent prosecution was pursued without intent to deceive and with care commensurate to the duty owed the Patent Office.

nal claim for reasons of clarity or to comply with a Patent Office regulation. As noted by the Third Circuit in *Trio Process:*

. . . by redrafting or abandoning a claim in the face of a prior art rejection, the patentee is conceding that he has not invented what he thereby disclaims, and therefore will not be heard to assert, at a later date, what he disclaimed as his invention. Accordingly, for "file-wrapper estoppel" to become operable, it is necessary, at the least, that a claim have been narrowed to avoid the prior art. *Bishman Mfg. Co. v. Stewart-Warner,* 380 F.2d 336 (7th Cir.), cert. denied, 389 U.S. 897, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967).

Here, the claims were redrafted, not because they trespassed upon the prior art, but because they were considered misdescriptive in view of the specification of the patent. The rejection here was a technical matter based on the Rules of Practice of the Patent Office, and had nothing to do with the question whether the matter rejected was patentable. In such a situation, it would not be equitable to deprive a patentee of the full fruits of his invention because of a formalistic rule of the patent office. See *Peterson Filters & Engineering Co. v. Einco Corp.,* 155 U.S.P.Q. 89 (D.Utah, 1967), aff'd. 406 F.2d 431, 438 (10th Cir. 1968).

461 F.2d 66 at 75.

■ Here, plaintiff asserts, the claims as originally stated in the application were altered in order to put them in a single independent claim and consequently this is not a proper case for invocation of the file wrapper estoppel doctrine. While I agree with plaintiff that the doctrine is limited to instances where the claims of a patent have been altered to distinguish them from the prior art, I do not agree that the claims in the instant case were altered solely as a matter of form to state them independently rather than dependently.

The initial application for the patent-in-suit contained ten claims, all of which were rejected by the Patent Office Examiner as either anticipated by the prior art or unpatentable over the prior art for obviousness. Several of the claims were written in general terms and did not specify any particular range of measurements for the film dimensions referred to. Two of those original claims had specified film thickness of about one to about eight mils.[14] One of the claims had specified boss heights of about 3 to about 12 mils.[15] Claim 10, incorporating claim 9, specified film with the dimensions ultimately claimed in the application which was approved, i. e., thickness of about 1 mil, boss height of about 3 to about 4 mils and the channel-like areas spaced apart about 10 mils.[16]

After rejection of the original application in light of the prior art, the applicants submitted a new eleventh claim. This claim incorporated the narrow dimensions set forth in the old claims 9 and 10, and some explanatory language not included in the rejected claims.[17] In support of this new claim the applicants argued *inter alia* that none of the patents cited by the examiner "disclose or suggest the claimed film covered by claim 11 wherein the embossed film has specific rectangular networks spaced apart by about 0.010 inch with boss heights on the order of 0.003 to about 0.004 inch for polyethylene and polypropylene films on the order of 1 mil in thickness to provide a visual appearance of fine ribbed woven fabric without a shiny plastic surface and which film resists edge curling under

---

**14.** See plaintiff's Exhibit 2, the United States Patent Office file wrapper for the patent-in-suit. In particular, see original claims four and eight.

**15.** See original claim 3 from the file wrapper.

**16.** Original claim 5 had also specified boss height of about 3 to about 4 mils without specifying any limitations in the other dimensions.

**17.** For example, the new claim specified that the network of channels and bosses produced a soft fabric-like tone without a shiny surface effect and in addition that the edge curl resistance referred to was resistance under machine stress along the lengthwise direction of the film.

machine stress".[18] These dimensions were cited at another point by the applicants in explaining that it was the network of channels and bosses of the dimensions specified which produced the soft fabric-like tone without a shiny surface effect.[19] Finally, in distinguishing claim 11 from the prior art the applicants pointed out that the Smith patent, which had been cited by the Patent Office Examiner in rejecting the patent application initially, made no reference to film on the order of about 1 mil in thickness "where the problem [of edge curl] is found to exist".[20]

It seems clear to me that the applicants relied on these specific dimensions to distinguish their invention from the prior art. And at least in the case of the film thickness and boss height they relied on these dimensions in contrast to the broader dimensions they had originally claimed. I do not accept plaintiff's contention that the Patent Office Examiner simply approved a change in form from a dependent to an independent statement of the claims. Rather, I believe that the Examiner was convinced to grant the patent application after the applicants' presentation in part because he understood that the combination of the narrowed dimensions accomplished a particular effect in terms of the film's appearance. In particular, this understanding appears to have contributed to his conclusion that the film claimed was not anticipated by the prior art.[21] Accordingly, I find that plaintiff is estopped from contending that the accused films, though not literally infringing, nevertheless are the equivalent of the patented film.

This conclusion cannot end the Court's analysis of the infringement issue, however. Plaintiff asserts that each of the four samples of accused film introduced into evidence *literally infringe* the claim of the patent-in-suit. The issues thus posed are relatively easy of resolution in the areas of boss height and film thickness. They are more difficult in the context of a comparison between the planar dimensions of the patent claim and those of the accused film.

At the outset I should record my acceptance of the measurements of the accused film made before and during the trial by plaintiff's chief engineer, Arthur Raffel. Raffel testified to twenty years of experience measuring films in order to provide engravers with proper dimensions for embossing rolls. Based on this experience and on his knowledgeable explanation at trial, I am persuaded that Raffel's methods of measurement were accurate ones, representative of methods used by people skilled in the art to take film measurements. Since Raffel's measurements both before and during trial showed that all four of defendants' films have a boss height between 3 and 4 mils, literal infringement was established with respect to this dimension.

Turning to film thickness, Raffel's measurements showed that three of defendants' films were 1 mil in thickness and that one was 2 mils in thickness. It is, of course, clear that the first three literally infringe the claim of a film of "about 1 mil" in thickness. In order to determine whether the fourth literally infringes we must examine the overall context in which the word "about" is used. *Kolene Corporation v. Motor City Metal Treating, Inc.,* 307 F.Supp. 1251 (E.D.Mich.1969), *aff'd* 440 F.2d 77 (6th Cir. 1971), *cert. denied* 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971); *Johnson & Johnson v. W. L. Gore & Associates, Inc.,* 377 F.Supp. 1353 (D.Del.1974); *Raybestos-Manhattan, Inc. v. Texon, Inc.,* 268 F.2d 839 (1st Cir. 1959). Ultimately, the answer must depend on whether a person skilled in the art would read the claim of the patent to contemplate a range which includes the

---

18. See p. 35 of the file wrapper.

19. See p. 33 of the file wrapper.

20. See p. 35 of the file wrapper. Also see p. 36 of the file wrapper.

21. The examiner apparently further concluded that the combination of these dimensions with the reorientation of channels with respect to the free edge in order to solve the edge curl problem with taffeta film was not obvious in light of the prior art.

accused product. *Johnson & Johnson v. W. L. Gore & Associates, Inc., supra,* at 1355.

When plaintiff first began supplying film to Diana as underpad backing in 1960 or 1961, the film was 2 mils thick. For the next 2 to 3 years, however, consumer demands generated by the increasingly competitive disposable products market, exerted constant pressure to reduce the film thickness to 1.5, 1.25, 1.1 and then to 1 mil. As earlier noted, as film thicknesses decreased, the problem of edge curl grew more intense. At the time of the invention the industry was supplying 1 mil film to its customers and they were encountering serious edge curl problems. After the introduction of square taffeta, Clopay was able to meet its customers demands for even thinner films of ¾ mils and in some cases ⁶⁄₁₀ mils.

The history of edge curl—increasing severity as film thicknesses decreased and the discovery of a solution at a time when consumers were demanding film of 1 mil or less—and the industry's ability to discriminate in film thicknesses by increments as small as .25 or .10 mil convince me that at the time of the issuance of the patent in suit, one skilled in this art would not read a claim to film of "about 1 mil" in thickness to be infringed by a 2 mil film. Accordingly, I find that three of the accused films have a thickness of "about 1 mil" [22] but that the fourth does not.

Finally, I turn to the planar dimensions of the claim and the accused films. It will be recalled that the claim speaks of channel-like areas, perpendicular to the free edge, which are "spaced apart about" 10 mils. At trial all of the measurements of the accused films indicated that the center-to-center distance of the design—that is the distance from any given point on a boss or channel to the same point on the next boss or channel—was about 20 mils. This is the extent of the agreement between the parties, however. Defendants' experts, utilizing photomicrographic techniques, measured the distance between the end of one channel-like area and the beginning of another on the accused films as being between 17.6 mils to 18.2 mils. Raffel, on the other hand, also measured the planar dimensions of the accused films and concluded that the channel-like areas were spaced apart by 10 mils. The difference between these results is attributable to differing selections of the point at which the measurement should begin and end. The crucial question, accordingly, is how a skilled artisan would interpret the claim when making the measurement required by the reference to channel-like areas "spaced apart about" 10 mils.[23]

While one of the figures in the patent purports to be a cross section illustrative of the claimed film and the specifications state dimensions for this illustration, it is clear from the record that one skilled in the art would know that a film produced pursuant to the teachings of the patent would not have channels with flat bottoms and discrete corners as literally depicted in this figure. The defendants recognize that the film described in the patent is a soft medium and that a cross-sectional view would be characterized by curves rather than corners. They maintain, however, that the claim, when read in the context of the figure and specifications, suggests that the planar dimension of a channel-like area is limited to the width of the bottom of the trough (e. g. 1.8 to 2.4 mils in the accused film) and accordingly, that the space between chan-

---

22. Defendants maintain that one of these films is actually .75 mil film. Based on my conclusion with respect to the correctness of Raffel's measurements and in the absence of any explanation by defendants as to how they arrived at their measurements, I must reject their argument as a matter of fact. In any case this difference is not significant as a matter of law. In light of the history discussed above, I conclude that one skilled in the art would read "about 1 mil" to include .75 mils.

23. Defendants have also urged that the patent's reference to channel-like areas "spaced apart about" 10 mils is intended to designate the width of the channels. I find this position untenable. I am confident that a skilled artisan would read this reference as one to the distance separating one channel-like area from another.

nel-like areas is substantially more than half of the 20 mil center-to-center dimension.

I conclude that the record does not support this view. It seems much more likely to me that the skilled artisan, in applying the concept illustrated by the figure of the patent in the context of an embossed plastic film of the kind specified would treat the portion of the film which slopes from the trough of a channel to the top of a boss as part channel and part boss and would include the planar dimension of film comprising the walls of the channel as part of the channel's width. This view is supported by the testimony of Raffel, who described the types of instruments and techniques people in his field utilize in measuring embossed plastic film, how the film would appear under the degree of magnification provided by those instruments, and, in particular, how one in this field would go about determining the dimensions of this kind of film. I accept his testimony as the best indicator in the record of how one skilled in the art would read and apply the teachings of the patent in suit.[24] Accordingly, I find that the accused films have channel-like areas "spaced apart about" 10 mils.

It follows that plaintiffs have established literal infringement with respect to all of the accused films except the one which is about 2 mils in thickness.

## III CONCLUSION

The patent is valid and infringed by three of defendants' accused films. An appropriate injunction and an order for an accounting will be issued. Attorneys' fees will not, however, be awarded to the plaintiff.[25]

Submit order.

---

24. Neither of defendants' experts, John Michael, an engraver, and John Rozanski, a lab technician at the United States Testing Company, are considered by the Court to be skilled in the art of embossed film production and consequently their testimony must be discounted on that basis. Although defendants' president and corporate vice president, Ivan Becker, is skilled in this field, the record is totally devoid of any explanation as to how he arrived at his 16 mil measurement, and I am therefore unable to place any weight in his findings.

25. Defendants commenced production of their films without knowledge of the patent. Between notification of the patent in January of 1972 and the filing of this suit on April 10, 1972, defendants continued production in what I believe was a good faith belief that the patent was invalid. At some point during this period they consulted counsel and received an opinion that the patent was invalid and the matter "would never come to court". The suit itself has presented litigable issues with respect to both validity and infringement and these issues have been pursued by both sides in a reasonable manner.